Joyce SAUCIER, et al., Appellants,

v.

COUNTRYWIDE HOME LOANS, et al., Appellees.

No. 11–CV–646.

District of Columbia Court of Appeals.

Argued June 6, 2012.
Decided April 18, 2013.

Thomas J. Henderson, with whom David W. Sanford, Sharon Y. Eubanks, and Carolyn Hahn, Washington, DC, were on the brief, for appellants.

Thomas M. Hefferon, Washington, DC, with whom Matthew M. Hoffman, Washington, DC, and Sabrina M. Rose–Smith

were on the brief, for appellee Countrywide Home Loans, Inc.

Daniel J. Tobin, for appellee Presidential Bank FSB.

Before THOMPSON and BECKWITH, Associate Judges, and REID, Senior Judge.

REID, Senior Judge:

These cases concern the rehabilitation and conversion into condominium units of rental apartments, located on Good Hope Road in the Southeast quadrant of the District of Columbia, and mortgage loans obtained for purchase of the condo units. After moving into their respective units, Joyce Saucier and ten other persons, plaintiffs/appellants, brought a lawsuit against Countrywide Home Loans, Inc. ("Countrywide") and Presidential Bank FSB ("Presidential"), defendants/appellees, alleging various causes of action, including common law fraud, conspiracy, and violations of the District of Columbia Consumer Protection Procedures Act ("CPPA"). Following extensive proceedings in the trial court, the Honorable A. Franklin Burgess, Jr., granted summary judgment in favor of Presidential on all counts, and in favor of Countrywide except with respect to three plaintiffs as to one CPPA count. Ms. Saucier and the other appellants contend that the trial court erred in granting summary judgment to defendants on their fraud claims, two of their CPPA counts, and their conspiracy claim. In addition, they challenge the trial court's ruling that their Condominium Association lacked standing to sue under the CPPA. We affirm the trial court's grant of summary judgment with respect to the common law fraud claim, the conspiracy claim, and D.C.Code § 28–3904(e), but we vacate the judgment pertaining to the CPPA claim under § 28–3904(f), and we hold that the Condominium Association

has standing to sue on behalf of its members.

## FACTUAL SUMMARY

The voluminous record reveals that at least five cases were filed in the trial court between the years 2004 and 2008, relating to rental apartment conversion to condominiums in the Good Hope Road area, and mortgage loans on condo units. Plaintiffs in these cases made similar claims. The trial court consolidated four of the cases ("the Fitzhugh cases") and decided to manage discovery in the Saucier case with the consolidated cases. However, the court issued separate comprehensive and dispositive memorandum opinions (each exceeding 100 pages) in the Fitzhugh and Saucier cases. Eventually, the parties settled the Fitzhugh cases, but the Saucier plaintiffs appealed their case to this court.

The Saucier case had its origin in the purchase of condo units in a fifty-two year-old renovated property known as "King's Court." Between January and August 2002, Ms. Saucier and the other ten plaintiffs closed on mortgage loans from either Countrywide (five loans) or Presidential (six loans). The loans were insured by the Federal Housing Administration ("FHA"), an agency within the federal Department of Housing and Urban Development ("HUD").

Plaintiffs/appellants' original complaint, filed in March 2005, involved forty-three counts, including fraud, fraudulent concealment, breach of contract, violation of the CPPA, and conspiracy. On August 23, 2007, in a fifty-three page memorandum opinion, the Honorable Brook Hedge granted motions to dismiss some of the original defendants and counts. The cases were re-assigned to the Honorable Joan Zeldon from the end of December 2007 to the end of December 2009. During that

time, a second amended complaint was filed in February 2008; the parties conducted extensive discovery and scheduled depositions. At the end of December 2009, the cases were transferred to Judge Burgess, who presided over continuing discovery and handled pre-trial filings and dispositive motions.

According to Judge Hedge's 2007 memorandum opinion responding to defendants' motions to dismiss, plaintiffs' original complaint alleged that four classes of defendants engaged in a "scheme to sell unsafe over-appraised condominiums to unsophisticated first time home buyers." One of the developer defendants allegedly "was the main organizer of the overall scheme." The complaint averred that the developer filed a public offering statement ("POS") containing assertions that the defendants allegedly knew to be false, and that "[i]nstead of being renovated in compliance with the representations made in the POS, the condominiums were poorly renovated ..., resulting in condominiums that are not only of lesser quality than promised, but that are actually unsafe to live in due to their many problems including, a roof that requires replacing, improper ventilation, and poor drainage." The second class of defendants, the "sales defendants," sought to convince prospective condo unit owners to purchase, in part, by allegedly "manipulat[ing]" figures comparing rental and ownership costs, telling "plaintiffs that the units and common areas were backed by a two-year warranty against defects and major repairs although they knew this warranty would not be honored," filling out and approving false applications for mortgage loans, and steering plaintiffs to certain mortgage lenders when they knew plaintiffs would not be able to make the mortgage payments. The mortgage defendants, specifically Countrywide and Presidential, who purportedly were protected because FHA insured the mortgages and because they resold the loans to other entities, "allegedly knowingly approved plaintiffs' loan applications knowing that the information on them was incorrect, that the property the plaintiffs were purchasing was overvalued, and that plaintiffs would be unable to repay their loans." Finally the "appraiser defendant," Chesapeake Appraisal, "allegedly intentionally over appraised the value of the condominiums to make the investment more attractive to potential creditors."

### Deposition Testimony and Supporting Documents

Plaintiffs' depositions, through fact and expert witnesses, were designed to provide support for their litigation theory.[1] Some

1. After moving into their units Ms. Saucier and the other plaintiffs encountered problems with their respective units, and with the common elements of the condominium building. These problems typically included faulty and outmoded plumbing and electrical systems that resulted in leaking washing machines and toilets, flooding, bursting pipes, ceiling collapses, moldy walls and window sills, and a defective ventilation system that caused asthma in children and adults. In addition, King's Court had a severe problem with the roof (the roof had to be replaced), mice, old bath tubs, and improperly laid carpet.

Plaintiffs/appellants' appraisal expert, Donald S. Boucher, indicated in his report that unit owners discovered construction defects after purchasing their properties. The roof proved defective and was replaced in 2006 by the condo association at a cost of approximately $60,000. Plumbing and waste water lines were not replaced during the renovation, and the old lines could not "accommodate the increased capacity requirements" from "the installation of modern amenities such as dishwashers and stacked clothes washers and dryers in the kitchens of each apartment." Consequently pipes burst, leading to water damage and mold. Anthony G. Poli, plaintiffs/appellants' architectural/engineering expert, issued a report concerning inaccuracies and deficiencies in the Public Offering Statement for King's Court, including those relat-

unit owners experienced financial problems before and after the purchase of their condo units. For example, Barbara Wilkerson, who bought her condo unit for $62,995, testified that she "walked away" from her previously owned home because she could not pay the taxes on the home. Adrienne Newell Currington co-owned her sister's car and a loan officer told her she would not be approved for a Presidential loan; however, a sales agent gave her money to get the car off of her outstanding credit indebtedness. In light of these types of ongoing financial difficulties, plaintiffs began to question the accuracy of the appraised value of their units, whether they had timely received certain documents before closing on their loans, the accuracy of documents they ultimately saw, and whether the mortgage defendants approved their loans even though they knew plaintiffs could not afford to make the mortgage payments. After purchasing their condo units, some of the plaintiffs obtained equity credit lines or loans, or refinanced their mortgages one or more times in an effort to meet ongoing obligations, including credit card payments and financing of automobiles.

Plaintiffs testified that they did not timely receive, or had no recollection of receiving, certain documents from the mortgage defendants that may have influenced their decision as to whether to purchase a condo unit. Four documents were mentioned specifically: the Informed Consumer Choice Disclosure Notice, the POS, the Notice of Right to Copy of Appraisal, and the actual appraisal of their respective condo units. There is no Informed Consumer Choice Disclosure Notice in the record for Katie Carter, Traci Hamilton, Michael Maxwell, and Carlton Wilson. The

notice for Roosevelt Hall appears in the record; it is signed (presumably by him) but undated. The notice appears in the record for the other appellants and is signed and dated.

Traci Hamilton maintained that she did not receive the POS until after closing, and that it contained a false statement, namely that the "roof was only five years old." There is no Notice of Right to Copy of Appraisal for plaintiffs/appellants Carter, Hall, Hamilton, Maxwell, Wilson, and Dixon. However, there is a signed and dated notice for the other plaintiffs/appellants. Katie Carter and Roosevelt Hall denied receiving an appraisal, and Michael Maxwell did not remember receiving an appraisal before closing.

In addition to the specified documents, plaintiffs/appellants claim that they did not receive certain information, or accurate information, from the mortgage defendants that may have influenced their decision to purchase a condo unit—information that they could not afford to pay off the mortgage loan, that the loans did not comply with FHA/HUD guidelines and regulations, that the appraisals were inflated, and that the rehabilitation of the condo building was defective or lacking in new equipment and a new roof. The appraisal report that Ms. Hamilton eventually received stated falsely, she claimed, that the condo building "has a new flat rubberized bituminous membrane roof." Katie Carter's appraisal said: "The subject has a flat rubberized bituminous membrane roof that has been replaced," but there also was a later statement signed by Countrywide's underwriter that specified: "needs roofing cert." A "notice to homeowner" statement

---

ing to the condition of the roof and its replacement cost, and drainage and ventilation system problems. Ronald Schaible, another one of plaintiffs/appellants' witnesses, focused

on mold contamination; he asserted that: "Environmental testing detected evidence of mold contamination that was more likely than not caused by water intrusion events."

contained in the Chesapeake appraisal report for Carl Wilson said that the condo building "has a flat rubberized membrane roof that has been replaced." [2] Sheleta Bedney Watts testified that she took a friend and the friend's father to her meeting with sales agents, and that a sales agent told them the water heater, boiler, and other equipment "all would be replaced" and that "the roof was only a matter of just a few years old."

One of the documents in plaintiffs' files was a form entitled "Direct Endorsement Approval for a HUD/FHA Insured Mortgage." This form was present in all of the plaintiffs' loan files. The form was signed and dated, except for plaintiffs Michael Maxwell (signature but no date), Adrienne Newell, Regina Dixon, and Barbara Wilkerson (signed but not dated), and Emma Pittman (no signature/date).

Plaintiffs/appellants' expert, Dr. Calvin Bradford, a sociologist and consultant and a former HUD employee, reviewed document files, including the loan files of plaintiffs who received Countrywide loans. It was his written "opinion" that "the circumstances in this case fall within the general historical context of lending patterns and practices that have exploited minority buyers through loans that contained misrepresentation, misleading information and that failed to properly inform borrowers of the true conditions of the property or loan." Specifically, he stated, in part, that "[t]here [wa]s no evidence that either lender conducted an inspection of any unit by an FHA approved fee inspector," but "[n]onetheless, the lenders [mis]represented in certifications to the FHA that the property met the FHA underwriting standards and conditions." Furthermore, he concluded, "by approving the loans without meeting [the fee inspection requirement],"

the lenders were also misrepresenting to the borrower that the property met FHA standards." He opined "that the defendant lenders knew or should have known of any basic issue with the building systems in King's Court that caused damages to plaintiffs' units," that "the lenders misrepresented to the FHA that the issue with the roof was resolved by signing certifications that the property was acceptable," and that "several of the applicants were only marginally qualified, and perhaps not qualified, for the loans based on the FHA underwriting standards."

Plaintiff's appraisal expert, Donald S. Boucher, reviewed eleven appraisal reports prepared by Catherine M. Huber Moore for eleven units purchased by plaintiffs. He declared during his deposition that the appraiser of the eleven units failed to conduct "a thorough inspection of the property," and contrary to general appraisal practice, "relied on comparables in the same project." In addition, because the renovation project had not been completed by the time most of the appraisals were done, a final inspection of the property should have been made, or a sum of money should have been placed in escrow. In Mr. Boucher's opinion, the appraised value of three units should have been $706,500, rather than the stated appraised value of $776,495. Mr. Boucher's written report noted that the appraiser had made assumptions that were not grounded in fact. For example, the appraiser of King's Court assumed that the apartment building had been "gutted" and renovated, but it was not gutted; and she further assumed the existing roof had been removed and replaced with a new roof, but that was not true. Mr. Boucher concluded that the appraiser failed to "conform to generally accepted appraisal practices, generally ac-

---

**2.** The appraisal reports for most of the plaintiffs contained the statement: "The subject has a flat rubberized bituminous membrane roof" or "a flat rubberized membrane roof."

cepted loan underwriting guidelines and USPAP [Uniform Standards of Professional Appraisal Practice] Standards and requirements."[3]

Fact witnesses who worked for defendants also were deposed, as plaintiffs sought to establish the theory of their causes of action. Doretha Austin, who was employed as a sales agent, denied ever telling plaintiffs "that the units were fully gutted and renovated"; she stated only that the units were "[n]ewly renovated." Her "biggest stress problem and [her] biggest concern" was "[t]he flooding at King's Court." A developer, Eric Fedewa, denied hearing about sales agent Roger Black's "paying off a buyer's car note in order to help [her] get approved." Mr. Fedewa acknowledged that he did not have "[t]he whole roof replaced" at King's Court, and that "a lot of the tubs, if not most of the tubs," were not replaced "because they were lead, ... porcelain tubs that were in good shape" and cutting them out would have "cause[d] a lot of damage." Consequently, the tubs were "cleaned" and "reglazed." When asked what role he played in drafting the POS for King's Court, Mr. Fedewa responded, "Not much," but he did review the POS. The POS indicated that the roof had been "[r]epaired and covered ... with coping, gutters downspouts, and cornice," and that the roof had

a "useful life" of fifteen years, with a replacement cost for "roofing/gates" of $30,000 in "2001 dollars." Plaintiffs submitted a March 8, 2001, "Building Condition Survey" prepared by an architectural firm and an engineering firm, which included the following statement about the roof: "According to the management, the roof was replaced about 7 years ago and is built-up with an aluminized coating."

Tracy Brosnan, the loan officer and processor for Presidential, stated that she did not "run credit reports on buyers." Ms. Saucier and the other appellants did not have to make down payments on their respective units, because these payments were covered by a gift from a non-profit organization, Ameri–Dream. The seller of the condo units funded the down payments and also paid the nonprofit's administrative fees relating to the payments. Ms. Brosnan maintained that she did not make any representations about repairs to or the condition of the King's Court building.

Patricia Mills, an appraiser for Countrywide, asserted that the developer of King's Court informed her that "there was a new rubber bituminous membrane put on the roof" at King's Court; the lender is required to file a new roof certification but there was none in the file; and had she been aware that there was a defect in the

3. Kathryn Edelen, an underwriter who was employed by Countrywide during the period in which Countrywide made loans to some of the Saucier plaintiffs, testified that FHA's approval of the condo project was conditioned on a final inspection and 51% owner occupancy. FHA required a final inspection only if the project was not complete at the time of FHA's review. FHA also required an underwriter to review the appraisal of the premises. Kelly Rupard, an underwriter for Presidential, stated that FHA had a requirement that the underwriter analyze the appraisal and examine the condition of the property because each unit needed to be in good condition. A HUD fee inspector, whose name appeared on

a HUD-approved list, had to perform the final inspection. All rehabbed units were subject to final inspection and certification. The fee inspector would have to be able to show that the builder or condo association had certified that "51 percent of the units have been sold and that 51 percent of the units are going to be owner occupied before FHA will insure the mortgage for the purchase of a single unit," and the underwriter is responsible for making sure that the certification has been made and appears in the file. Ms. Rupard did not recall ever seeing a final inspection report from a HUD fee inspector in the files, but thought it was possible that the report was submitted directly to HUD.

roof, that would have had an effect on the appraised value of the property. Catherine Moore, an appraiser for Presidential, stated that she saw reference to King's Court's "new flat rubberized . . . bituminous membrane roof" in a document and included that statement in her appraisal report, but she could not recall getting the information from the developer. She also indicated in her appraisal report that the King's Court units had been "gutted and renovated." She could not remember how she learned about this information, but she generally assumed that if fresh drywall is in a unit, it had been gutted and renovated.

Countrywide's expert, Middleton Thompson, and Presidential's expert, William Heyman, disputed many aspects of plaintiffs/appellants' claims regarding the loan approval process, and HUD/FHA requirements. Mr. Thompson reviewed the five Countrywide loan files; he addressed and disagreed with many of the conclusions reached by plaintiffs/appellants' expert, Calvin Bradford. Similarly, William Heyman, Presidential's expert, reviewed the Presidential loan files and opined that the loans were processed properly.

### The Trial Court's Summary Judgment Decision

At the conclusion of discovery, and after dispositive motions were filed, Judge Burgess issued two separate memorandum opinions, a 114–page memorandum in the Fitzhugh cases on November 22, 2010, and a memorandum in excess of 100 pages in the Saucier case on March 28, 2011. In the Saucier case, Judge Burgess considered four alleged misrepresentations by the mortgage lenders: (1) mortgage loans made to plaintiffs/appellants "complied with FHA guidelines when they did not"; (2) "plaintiffs could afford their loans when they could not"; (3) "the appraisals [of the condo units] reflected the true value of the units when they were inflated"; and (4) "the construction of the units was sound." He determined that the mortgage lenders made no explicit misrepresentations, and he rejected plaintiffs/appellants' argument that by approving the mortgage loans, the mortgage lenders made implied misrepresentations concerning FHA guidelines, plaintiffs' capacity to make the purchases and repay the loans, the value of the units based on the appraisals, and the soundness of the construction. Judge Burgess further concluded that the mortgage lenders made no material omissions because, based on Maryland law which he applied (due to the lack of relevant District law), plaintiffs/appellants failed to show a duty on the part of the mortgage lenders to disclose details regarding construction, appraisal, loan approvals, and violations of FHA guidelines and regulations. Consequently, Judge Burgess dismissed plaintiffs/appellants' common law fraud claims.

Judge Burgess also addressed plaintiffs' CPPA claims. He determined that most had not made a sufficient showing about alleged violations of D.C.Code §§ 28–3904(e) and (f).[4] He acknowledged that in his Fitzhugh memorandum, "the [c]ourt held that the CPPA imposed a duty on all merchants not to fail to state a material fact, and that there was no need to conduct a duty analysis for omissions under the CPPA subsection (f)." However, by the time he wrote his Saucier memorandum, Judge Burgess had changed his mind, based on the Supreme Court's interpretation of the Security and Exchange Com-

---

4. Judge Burgess found that plaintiffs Carter, Hall, and Maxwell "have created a material issue of fact concerning whether they received their appraisals" under the CPPA, D.C.Code § 28–3904(f). Subsequently, these three plaintiffs dismissed their remaining claims under D.C.Code § 28–3904(f), thus paving the way for their appeal.

mission's Rule 10b–5, which he stated "closely resembles the CPPA's subsection (f)." In justification of his changed interpretation of D.C.Code § 28–3904(f), Judge Burgess said: "If the [c]ourt did not adopt a duty analysis, then a lender could be held liable for almost any defect in collateral on which it makes a loan, as long as it met the relatively loose standard of materiality." He declared that his conclusion "that the [mortgage lenders] had no common law duty to disclose the omissions alleged in plaintiff's fraud count ... applies equally to plaintiffs' CPPA claims."

Furthermore, Judge Burgess granted summary judgment on plaintiffs' conspiracy theory. He also found that the Condominium Association had not met associational standing requirements, and with respect to claims it asserted in its own behalf, the condo association had failed to establish injury-in-fact.

### ANALYSIS

◼ Our review of the trial court's summary judgment decision is *de novo*, and hence, we conduct an independent review of the record, construing it in the light most favorable to the non-moving party. *Boyrie v. E & G Property Servs.*, 58 A.3d 475, 477 (D.C.2013) (citation omitted). "Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Gomez v. Independence Mgmt. of Delaware, Inc.*, 967 A.2d 1276, 1281 (D.C.2009) (citations omitted).

### *The Common Law Fraud Claim*

Ms. Saucier and the other appellants contend that the trial court erred in granting summary judgment on their fraud claim by "impos[ing] its own element to fraud, namely the requirement that the loan companies owed a pre-existing duty to

borrowers." They fault the trial court for relying on Maryland precedent. They claim that "under District of Columbia law, the existence of a duty is not required where a claim for fraud is based on a material omission." Furthermore, they argue, when "Countrywide and Presidential communicated to [b]orrowers that their loans were approved, under District of Columbia law, they were obligated to reveal the whole truth—*i.e.*, that borrowers' loans did not conform to HUD guidelines—regardless of whether there was a duty of disclosure between the parties at common law." They complain that the trial court should have ruled "that a reasonable jury could find that the [mortgage lenders'] failure to advise borrowers that their loans did not comply with HUD guidelines constitutes actionable fraud."

In addition, plaintiffs/appellants insist that "the relevant inquiry is not whether the [mortgage lenders] explicitly made material misrepresentations, but whether the information they failed to provide in approving [b]orrowers' loans—that the loans did not comply with HUD guidelines—'materially qualified' their statements." They also claim that "the [mortgage lenders'] representations that [b]orrowers' loans were approved simultaneously constituted an implied representation that the loans 'complied with FHA guidelines, ... the appraisals were accurate, and that the units were well-built.'" They assert that the trial court erroneously "requir[ed] proof of an explicit misrepresentation even where, as here, a defendant's statements implicitly misrepresent material facts."

In response, Countrywide agrees with the trial court that a statement regarding the approval of a plaintiff's mortgage loan "could not be the basis for liability ... because the statement was indisputably

true."[5] Hence, plaintiffs/appellants failed to "ma[k]e out an issue for trial based on an alleged express misstatement." Countrywide argues that the trial court correctly ruled that "an omission is not actionable unless the defendant had a duty to disclose the omitted fact," and that the trial court was "plainly correct" in "finding that Countrywide had no duty to volunteer facts about the FHA program, about the appraisals or value, or about property conditions." The court's conclusion was accurate according to Countrywide, "because there was no special or fiduciary relationship between Countrywide and the [b]orrowers," only "an ordinary borrower-lender relationship," and the lender's duty under federal law is to HUD, not to the [b]orrowers. Countrywide further claims that appellants "offered no evidence that Countrywide expressly told any [b]orrower that his or her loan had been 'approved.'" And, Countrywide made no implied "statements about the loan, about underwriting standards used by the creditor, about the value, condition and worth of the collateral, and about how 'legitimate' the transaction was."

Presidential also supports the trial court's findings and conclusion that the mortgage lenders made no explicit or implied misrepresentations; that a statement about loan approval did not "qualify as fraud by omission," because Presidential had no "duty to speak." Like Countrywide, Presidential in its brief emphasizes Judge Burgess's statement in his memorandum opinion—that "various courts, including the Supreme Court, ... have held that a lender's duties regarding FHA violations are owed to HUD, *not* to borrowers." (Emphasis in original). Presidential contends that there is no clear and convincing evidence "that Presidential and its employee [Ms.] Brosnan made knowingly false misrepresentations with the intent of deceiving [a]ppellants."

" 'The essential elements of common law fraud are: (1) a false representation (2) in reference to material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action is taken in reliance upon the representation.' " *Fort Lincoln Civic Ass'n, Inc. v. Fort Lincoln New Town Corp.*, 944 A.2d 1055, 1074 n. 22 (D.C.2008) (quoting *Bennett v. Kiggins*, 377 A.2d 57, 59–60 (D.C.1977)).[6] In determining whether there is a valid claim for common law fraud, we have adhered to the following legal principles. "A false representation may be either an affirmative misrepresentation or a failure to disclose a material fact when a duty to disclose that fact has arisen." *Rothenberg v. Aero Mayflower Transit Co., Inc.*, 495 F.Supp. 399 (D.D.C.1980). "A misrepresentation is an assertion that is not in accord with the facts." *Sarete, Inc. v. 1344 U Street Ltd. P'ship*, 871 A.2d 480, 493 (D.C.2005) (citing RESTATEMENT (SECOND) OF CONTRACTS, *Introductory Note* and § 159). "A misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so."

---

5. Countrywide claimed it "made no express representation that it approved the loans."

6. *See also Schiff v. American Assoc. of Retired Persons*, 697 A.2d 1193, 1198 (D.C. 1997) (a showing of common law fraud requires proof that a person or entity (1) "made a false representation of or willfully omitted a material fact"; (2) "had knowledge of the misrepresentation or willful omission"; (3) "intended to induce [another] to rely on the misrepresentation or willful omission"; (4) the other person "acted in reliance on that misrepresentation or willful omission"; and (5) "suffered damages as a result of his[/her] reliance") (citing *Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 706 (D.C. 1981)).

*Id.* (citing RESTATEMENT, § 162(2) (internal quotation marks omitted)). "Nondisclosure of material information may constitute fraud, especially where there is a duty to disclose." *Pyne v. Jamaica Nutrition Holdings, Ltd.,* 497 A.2d 118 (D.C.1985) (citing *Rothenberg, supra,* 495 F.Supp. at 406). "[M]ere silence does not constitute fraud unless there is a duty to speak." *Kapiloff v. Abington Plaza Corp.,* 59 A.2d 516, 517 (D.C.1948).

On this record, and in light of applicable legal principles, we are persuaded that Judge Burgess properly granted summary judgment to Countrywide and Presidential on plaintiffs/appellants' common law fraud claim. While a statement by Countrywide and Presidential that a mortgage loan has been approved is material, it is not false since the record shows that to purchase their respective condo units, all of the plaintiffs/appellants received mortgage loans from either Countrywide or Presidential.

But, plaintiffs/appellants' central argument is that in stating that their loans were approved, Countrywide and Presidential "were obligated to reveal the whole truth—*i.e.,* that Borrowers' loans did not conform to HUD guidelines"; they maintain that "the relevant inquiry is not whether the [mortgage defendants] explicitly made material representations, but whether the information they failed to provide in approving Borrowers' loans—that the loans did not comply with HUD guidelines—'materially qualified' their statements." Moreover, plaintiffs/appellants contend that the loan approval statement constituted an "implied representation that the loans 'complied with FHA guidelines, ... the appraisals were accurate, and that the [condo] units were well-built.'" We cannot agree.

Our case law is instructive. In *Schiff, supra,* appellant sought to establish that the American Association of Retired Persons ("AARP") committed fraud because it represented that the "allowance" it received from an insurance company (which was related to its group insurance contract) covered administrative costs, when it actually was a commission for AARP. We held that appellant failed to show a false representation of a willfully omitted material fact since "[i]t [wa]s not disputed that AARP disclosed to its members that it received an allowance and interest from its insurance and investment programs." *Schiff, supra,* 697 A.2d at 1198. Similarly, here, there is nothing false about the statement that a loan has been approved for each plaintiff since all of the plaintiffs received loans from Countrywide or Presidential.

From plaintiffs/appellants' perspective, the remaining questions are whether Countrywide and Presidential had some obligation or duty to inform plaintiffs/appellants that certain alleged circumstances regarding HUD and FHA requirements compelled the mortgage banks to "materially qualify" their statements about loan approval, or whether the approval statement contained certain implied representations. *Kapiloff* and *Pyne, supra,* provide insight into these issues. The appellant in *Kapiloff* agreed to purchase designated property owned by appellee. Appellant decided not to go through with the transaction after learning about an Act of Congress that made the property vulnerable to acquisition by the federal government. As a result, appellee sued the broker to regain half of the fee it had deposited. Appellant intervened and alleged fraud and misrepresentation because appellee failed to disclose the Act of Congress that could have affected the property in question. We declared that there had to be "a duty to speak," and that there was none in that case because the Act of Congress was "as

readily available" to appellant as it was to appellee. *Kapiloff, supra,* 59 A.2d at 517. The same can be said with respect to HUD's and FHA's guidelines and regulations, that is, there was "no duty to speak" because the guidelines and regulations were equally available to plaintiffs/appellants and to the mortgage lenders.

The appellants in *Pyne* were directors of the company that they sued. On behalf of the company, they had negotiated contracts in the District with shipping companies. 497 A.2d at 131. Appellants received commissions from the shipping companies with whom they contracted, but they did not disclose the commissions to the company. The company sued appellants for fraud. We determined that appellants had a duty to disclose because of their fiduciary relationship to the company, and that the failure to disclose amounted to fraud and breach of their fiduciary duty. *Id.* at 132–33.

Both *Kapiloff* and *Pyne* reveal that in common law fraud cases, we have looked to a duty to disclose information before holding that a "nondisclosure was material and resulted in any injury." *Kapiloff, supra,* 59 A.2d at 518. In this case, plaintiffs/appellants have not presented us with cases in this jurisdiction establishing a duty of mortgage lenders to disclose to a mortgage loan recipient, whose loans are insured by FHA, HUD, or FHA guidelines and regulations when notifying a borrower that a loan has been approved. Even if we were to impose a duty under our common law to disclose the guidelines and regulations under the circumstances of this case, the record does not reveal any clear and convincing evidence of an intent, on the part of Countrywide and Presidential, to deceive plaintiffs, which is the fourth element of a *prima facie* common law fraud claim. *See Fort Lincoln Civic Assoc., Inc., supra,* 944 A.2d at 1074 n. 22.

Furthermore, we do not believe that § 529 of the RESTATEMENT (SECOND) OF TORTS, is helpful to plaintiffs/appellants in this case. That section provides that a representation may be misleading because it is incomplete when it fails to state additional qualifying facts.[7] We think it is an unwarranted stretch on this record to conclude that the mortgage lenders' statement that a loan has been approved is materially qualified, or implies representations about (1) the condition or value of the underlying property which serves as collateral for the loan, (2) the financial condition of the purchasers, or (3) whether HUD or FHA requirements have been satisfied by the mortgage lenders. Significantly, perhaps, the Direct Approval for a HUD/FHA Insured Mortgage contains no explicit or implied representation by the mortgage defendants. In short, we are persuaded on this record that Judge Burgess properly analyzed plaintiffs/appellants' common law fraud claim.

### The CPPA Claims

We turn next to plaintiffs/appellants' statutory claims under the CPPA. Ms. Saucier and the other appellants contend that the trial court erred in granting summary judgment to Countrywide and Presidential on plaintiffs' CPPA claims. They take issue with the trial court's conclusion that the mortgage lenders made no "material representations in approving the [b]orrowers' loans." They reiterate, as they maintained with respect to their common

---

7. Section 529 of the RESTATEMENT (SECOND) OF TORTS provides:

Representation Misleading Because Incomplete: A representation stating the truth so far as it goes but which the maker knows or believes to be materially misleading because of his failure to state additional qualifying matter is a fraudulent misrepresentation.

law fraud claim, that Countrywide and Presidential "affirmatively misrepresented the fact that the loans met FHA requirements, that the transactions were legitimate, and that the units they were buying had been fully rehabilitated and were worth the purchase prices." Hence, they claim they "presented a triable issue as to whether those statements would tend to mislead a reasonable person to believe the conditions and requirements for approval had been met, in violation of [s]ubsection (e) of the CPPA." With respect to D.C.Code § 28–3904(f), plaintiffs/appellants assert that "there is no requirement for a pre-existing fiduciary relationship between the merchant and the consumer." Rather, the statutory duty imposed on merchants under the CPPA is "the duty not to 'fail[ ] to state a material fact' during the course of a consumer transaction." They also criticize the trial court for importing federal securities case law into the CPPA, rather than relying on the Federal Trade Commission Act.

Countrywide replies that the trial court reached the correct decision regarding appellants' CPPA claims. It maintains that the trial court's resolution of appellants' common law fraud claim controls their claim under D.C.Code § 28–3904(e), and therefore, appellants cannot prevail. As for the claims under subsection (f), Countrywide contends that the trial court accurately concluded that the claim must fail due to the failure to establish a duty to disclose matters relating to Countrywide's compliance with FHA guidelines. It supports the trial court's reliance on federal securities law in finding the necessity of a duty to disclose.

Presidential argues that appellants failed to show that it violated D.C.Code § 28–3904(e), because the statement "your loan has been approved" is not an express misrepresentation, or an affirmative representation that the property to be purchased is "in good condition" or "complies with FHA requirements," or "the price [of the condo unit] is appropriate." In addition, Presidential asserts it did not violate D.C.Code § 28–3904(f) by failing "to disclose certain purported violations of FHA guidelines and regulations," because the bank "never made any representation, express or implied, regarding FHA requirements," "in the underwriting and approval of the loan applications." There was no duty to disclose, and therefore, "silence cannot be construed as 'tending to mislead.' "

In their reply brief, plaintiffs/appellants contend that defendants/appellees have "a fundamental misunderstanding of Borrowers' claims." They "do not suggest," they say, that the defendants/appellees' "statements of loan approval were not, in some sense, literally true." Their argument is "that the statements were not true because they were incomplete," in that the mortgage defendants "did not reveal that the loans had been approved only because they had ignored and failed to comply with the FHA conditions and safeguards that were required for that approval." Furthermore, they reiterate that the trial court erred by "imposing the requirement of a pre-existing duty between the parties" and by relying on federal securities law.

■ We turn first to the applicable statutory provisions and the legal standard and principles which guide our analysis. One of the purposes of the CPPA is to "assure that a just mechanism exists to remedy all improper trade practices and deter the continuing use of such practices." D.C.Code § 28–3901(b)(1) (2012 Supp.). The pertinent alleged unlawful trade practices in this case are set forth in D.C.Code § 28–3904(e) and (f):

It shall be a violation of this chapter, whether or not any consumer is in fact

misled, deceived or damaged thereby, for any person to:

. . .

(e) misrepresent as to a material fact which has a tendency to mislead;

(f) fail to state a material fact if such failure tends to mislead;. . . .

We consider an alleged unfair trade practice "in terms of how the practice would be viewed and understood by a reasonable consumer." *Pearson v. Chung,* 961 A.2d 1067, 1075 (D.C.2008). Moreover, because it is a remedial statute, the CPPA must "be construed and applied liberally to promote its purpose." D.C.Code § 28–3901(c). Section 28–3904(e) and (f) reflect the same intent of other legislators enacting "State consumer protection statutes . . . to overcome the pleadings problem associated with common law fraud claims by eliminating the requirement of proving certain elements such as intent to deceive and scienter." *Fort Lincoln Civic Ass'n, supra,* 944 A.2d at 1073 n. 20 (citations omitted). Thus, a plaintiff "need not allege or prove intentional misrepresentation or [intentional] failure to disclose to prevail on a claimed violation of § 28–3904(e) or (f) of the CPPA." *Id.* at 1073. (citation omitted). However, under § 28–3904(e), a plaintiff must establish that a defendant made a misrepresentation, and under § 28–3904(f), that a defendant failed to make a required disclosure. *Murray v. Motorola, Inc.,* 982 A.2d 764, 784 (D.C. 2009); *see also Grayson v. AT & T Corporation,* 15 A.3d 219, 251 (D.C.2011) (en banc). With respect to a failure to state or disclose, "an individual's signature on a disclosure document gives rise to a rebuttable presumption that it was in fact delivered to her [or him]," but a person's "sworn affidavit" of non-receipt "is sufficient . . . to rebut the presumption of receipt." *Wiggins v. AVCO Financial Servs.,* 62 F.Supp.2d 90, 99 (D.D.C.1999) (citation omitted).

Furthermore, under § 28–3904(f), a plaintiff must show that an omission was material and had a tendency to mislead. D.C.Code § 28–3904(f). We look to the definition of "material" that appears in § 538(2) of the RESTATEMENT OF THE LAW (SECOND) TORTS:

The matter is material [if]:

(a) a reasonable man [or woman] would attach importance to its existence or nonexistence in determining his [or her] choice of action in the transaction in question; or

(b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his [or her] choice of action, although a reasonable man [or woman] would not so regard it.

*See Grayson, supra,* 15 A.3d at 252 n. 105. We also look to Maryland law as instructive in our jurisdiction. Under Maryland's Consumer Protection Act, "[a]n omission is material if a significant number of unsophisticated consumers would find that information important in determining a course of action." *Green v. H & R Block, Inc.,* 355 Md. 488, 735 A.2d 1039, 1059 (1999) (citations omitted). "Ordinarily the question of materiality should not be treated as a matter of law." *Id.*

■ With regard to the "tendency to mislead," a reasonable consumer generally would not deem an accurate statement to be misleading, and hence, such statement generally would not be actionable under § 28–3904(e) and (f). *See Whiting v. AARP, United Healthcare Ins. Co.,* 701 F.Supp.2d 21 (D.D.C.2010).

We agree with the trial court that summary judgment in favor of Countrywide and Presidential as to plaintiffs/appellants'

claims under D.C.Code § 28–3904(e) was proper on this record. Ms. Saucier and the other plaintiffs failed to establish that the mortgage defendants made an affirmative or implied misrepresentation, and hence, they cannot prevail on their subsection (e) claim. However, we reach a different result regarding the § 28–3904(f) claim.

The language of § 28–3904(f) is clear: "fail to state a material fact if such failure tends to mislead." Initially, in his memorandum opinion pertaining to the Fitzhugh cases, Judge Burgess concluded that the requirement to state a material fact that tends to mislead "exists regardless of whether the defendant had a common law duty to clarify the omission." Before resolving the Saucier case, however, Judge Burgess requested briefing. Apparently as a result of that briefing, the judge concluded "that under subsection (f) [he] must determine first whether a merchant had a duty to disclose, or at least determine the scope of that duty, before deciding whether the evidence is sufficient to create a jury question as to whether the information would have been material to the consumer." He then relied on the Supreme Court's interpretation of SEC Rule 10b–5 in determining that under § 28–3904(f), "omissions are not actionable without a duty to disclose."

We believe that Judge Burgess erred by abandoning his first interpretation of subsection (f) in the Fitzhugh cases, subsequently linking his interpretation closely to that of a common law fraud claim in this case, and relying on cases concerning securities regulation as guidance in interpreting subsection (f), rather than state consumer protection act cases, including those in Maryland.[8]

The Court of Appeals of Maryland construed a provision of Maryland's consumer protection law, which is similar to D.C.Code § 28–3904(f): "Unfair or deceptive trade practices include any: ... [f]ailure to state a material fact if the failure deceives or tends to deceive...." Md.Code Ann., Com. Law § 13–301 (West 1975, 1990 Repl.Vol. & 1998 Supp.). The Maryland appellate court reversed the trial court that had dismissed the consumer protection case "for lack of a fiduciary duty to disclose." *Green, supra,* 735 A.2d at 1058. In doing so, the court declared: "The [Maryland Consumer Protection Act] does not prohibit unfair or deceptive trade practices only between fiduciaries. Rather, it flatly prohibits the statutorily defined unfair or deceptive trade practices regardless of the relation between the consumer and the merchant." *Id.* Similarly, in construing its consumer protection statute,

8. Plaintiffs/appellants and Amicus Curiae National Consumer Law Center fault the trial court for importing the federal securities statute, which imposes a criminal penalty, into the District's consumer protection statute. They argue that reliance on the Federal Trade Commission ("FTC") statute and case law would be more appropriate. We note only that in its committee report on the consumer protection bill, the Council of the District of Columbia mentioned the procedures followed by the FTC, specifically its consumer education focus and its publicity. However, the Council did not expressly incorporate statutory interpretations of the FTC. *See* D.C. Council, Report on Bill 1–197 at 7 (Nov. 19, 1975) (the Public Services & Consumer Affairs Committee Report on the District of Columbia Consumer Affairs Committee). In contrast, the Massachusetts legislature incorporated FTC interpretations into its consumer protection act. As the court said in *Slaney v. Westwood Auto, Inc.,* 366 Mass. 688, 322 N.E.2d 768, 773 (1975): "[T]he courts are directed by the Legislature to be guided by the interpretations given by the Federal Trade Commission (FTC) and the Federal courts to § 5(a)(1) of the Federal Trade Commission Act...., [and] the Attorney General is empowered to make interpretive rules and regulations consistent with the FTC's and the Federal Courts' construction of the Federal act."

the Supreme Judicial Court of Massachusetts asserted "that the statutory words [u]nfair and deceptive practices . . . are not limited by traditional tort and contract law requirements." *Slaney v. Westwood Auto, Inc.*, 366 Mass. 688, 322 N.E.2d 768, 773 (1975) (internal quotation marks omitted); *see also V.S.H. Realty, Inc. v. Texaco, Inc.*, 757 F.2d 411, 417 (1st Cir.1985) ("Massachusetts case law suggests that one difference between a fraud claim and the more liberal [unfair or deceptive acts consumer protection statute] is allowance of a cause of action even in the absence of a duty to disclose."). Nor do the Illinois courts read a duty to disclose into that jurisdiction's consumer fraud and deceptive business practices act. *See Connick v. Suzuki Motor Co., Ltd.*, 174 Ill.2d 482, 221 Ill.Dec. 389, 675 N.E.2d 584, 595 (1996) ("[I]t is unnecessary to plead a common law duty to disclose in order to state a valid claim of consumer fraud based on an omission or concealment." (citation omitted)). In a Minnesota consumer fraud and deceptive trade practices case, the defendant mortgage company argued that "an 'omission can only give rise to a claim of misrepresentation where there is a duty to disclose the allegedly omitted information.'" *Minnesota v. Fleet Mortg. Corp.*, 158 F.Supp.2d 962, 966–67 (D.Minn.2001). The judge refused to dismiss the complaint and stated: "While there is no Minnesota case authority directly on point, other courts hold that while a duty to disclose may be required by common law fraud/misrepresentation, it is not required for liability under more broadly drafted consumer protection statutes." *Id.* at 967 (citations omitted).

■ Based on our understanding of the Council's intent, and on our review of consumer protection cases in other jurisdictions, we hold that D.C.Code § 28–3904(f) does not require a plaintiff to plead and to prove a duty to disclose information. 944 A.2d at 1073, n. 20. In enacting D.C.Code § 28–3904(f), the Council intended to circumvent some of the hurdles in holding merchants accountable for unfair trade practices, by avoiding a close link between the elements of a common law fraud claim, such as intentional misrepresentation or willful failure to disclose, and the elements of a claim under the CPPA. *See Fort Lincoln Civic Ass'n, supra*, Thus, we decline to read subsection (f) as imposing what the plain words of the statute do not require. But, in ruling as he did, Judge Burgess expressed concern that "a lender could be held liable for almost any defect in collateral on which it makes a loan, as long as it met the relatively loose standard of materiality." We disagree that the "materiality" standard is a "loose" one. Rather, "materiality" as defined in § 538(2) of the RESTATEMENT, *supra*, is a significant term that has specific meaning requiring proof. At any rate, we think that any concern about the impact of the materiality requirement on mortgage lenders should be addressed by the Council rather than this court.

■ Under § 28–3904(f), plaintiffs/appellants must show that the omitted information is material and has a tendency to mislead. In addition to concluding that the mortgage defendants had no duty to disclose the Informed Consumer Choice Disclosure Notice in this case, the trial court determined that there was no "evidence from which a reasonable jury could conclude that [plaintiffs/appellants] were qualified for other loan products offered by Countrywide." The notice is designed to make a potential condo unit purchaser "aware of possible choices in financing" by comparing FHA fixed rate financing with conventional fixed rate financing with mortgage insurance. In our view, the notice is material because "a significant num-

ber of unsophisticated consumers [c]ould find [the] information [in the notice] important in determining a course of action" regarding their purchase of a condo unit. *Green, supra,* 735 A.2d at 1059. But, the actual determination of whether the notice would be both material and misleading with respect to the plaintiffs who did not receive it, or who questioned whether they received it, is "a question of fact for the jury and not a question of law for the court." *Id.*

▪ Relatedly, in considering the appraisals of plaintiffs/appellants' respective condo units, the trial court properly recognized that "a reasonable jury could conclude that the facts contained in the[ ] appraisals would be relevant to a reasonable consumer," and therefore, the absence of the appraisal with respect to plaintiffs Carter, Hall, and Maxwell "is enough to create an issue of fact concerning whether they received their appraisals." To the extent that other plaintiffs (especially those for whom the record contains no signed Notice of Right to Copy of Appraisal, or no validly signed and dated receipt of appraisal form) can show that they did not actually receive an appraisal for their respective condo units prior to closing, that also would create a genuine issue of fact for the jury concerning the materiality of the appraisal. Thus, we are constrained to vacate the trial court's judgment as it pertains to § 28–3904(f), and remand the case for trial as to that claim.[9]

### The Conspiracy Claim

Plaintiffs/appellants contend that "the [trial] [c]ourt imposed elements for a conspiracy claim that do not exist under Dis-

trict of Columbia law," and that "the [c]ourt improperly made factual determinations that are properly left to the jury and made summary judgment improper." They assert that they "submitted substantial evidence that the [mortgage defendants], the seller, and the appraisers worked together to further their joint objective of making money through the sale of overpriced and un-renovated properties." The evidence included (1) the mortgage defendants' status as "preferred lenders," (2) "numerous meetings between Countrywide and Presidential, respectively, and the seller and sales agents … to accomplish the sales of the Borrowers' units," and (3) "[c]ontrary to FHA guidelines, the seller's agents filled out and sent Borrowers' loan applications or credit applications to the [mortgage defendants]." Plaintiffs/appellants also maintain that "the existence of an agreement may properly be established by circumstantial proof," including the fact that the mortgage defendants "allowed the [d]eveloper to select the appraisers for the units, in violation of FHA regulations," and "[t]he values provided in the appraisals closely matched the sales prices of each of the units." Countrywide and Presidential generally support Judge Burgess's analysis of the conspiracy issue. They claim that the sparse evidence presented by plaintiffs/appellants falls short of establishing a conspiracy. Presidential insists that plaintiffs/appellants' conspiracy claims are based on "speculation rather than evidence."

▪ The trial court devoted almost twenty pages in its memorandum opinion to the consideration and analysis of plain-

---

9. We leave it to the trial court to determine whether, without the imposition of a duty to disclose, genuine issues of fact exist regarding whether the mortgage defendants failed to disclose to plaintiffs/appellants certain infor-

mation under § 28–3904(f)—for example, that plaintiffs/appellants could not afford the mortgage loans, or that the appraisals were inflated.

tiffs/appellants' conspiracy claim. Contrary to plaintiffs/appellants' argument, Judge Burgess correctly set forth the elements of a civil conspiracy claim in this jurisdiction. He recited the elements of civil conspiracy from our decision in *Paul v. Howard Univ.*, 754 A.2d 297 (D.C.2000):

> To establish a *prima facie* case of civil conspiracy, [a plaintiff] ha[s] to prove (1) an agreement between two or more persons (2) to participate in an unlawful act, and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement pursuant to, and in furtherance of, the common scheme.

*Id.* at 310 (citing *Griva v. Davison*, 637 A.2d 830, 848 (D.C.1994)). *Griva* cites *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C.Cir.1983), for its statement of the elements of civil conspiracy. Judge Burgess rested part of his analysis of the civil conspiracy claim on *Halberstam*, a case which reviewed early decisions in this jurisdiction concerning the civil conspiracy cause of action. *Id.* at 479.

Judge Burgess analyzed the evidence presented by plaintiffs/appellants concerning the mortgage defendants' alleged conspiracy "to misrepresent the conditions of the [King's Court] property." He concluded that "the evidence in this case falls well short of showing the [m]ortgage [d]efendant[s'] knowing participation with [King's Court] in a scheme to deceive the buyers." He determined that the evidence revealed the mortgage defendants' "motive . . . to make money," but that there was "no evidence that could lead to an inference that [ ] the defendants were jointly deceiving the plaintiffs." Nor was there sufficient evidence on which "to conclude that the [m]ortgage [d]efendants had any knowledge of fraudulent misrepresentations by [Mr.] Fedewa to the plaintiffs about the completion of renovation and about defects such as the plumbing or the roofing." In

addition, Judge Burgess declared that the evidence of any conspiracy to inflate the appraisals was insufficient, in part because there was no "evidence of a relationship between Chesapeake [the appraiser] and the [m]ortgage [d]efendants other than that they were on the [m]ortgage [d]efendants' list of approved appraisers," and "no evidence that the [m]ortgage [d]efendants picked comparables or influenced the appraisal process in any way." Similarly, Judge Burgess concluded that there was insufficient factual evidence to infer any conspiracy by the mortgage defendants to make loans to plaintiffs/appellants who could not afford to repay their loans, and insufficient evidence of a conspiracy to violate FHA guidelines.

▉ "[L]iability for civil conspiracy depends on performance of some underlying tortious act"; "[civil] conspiracy is not independently actionable; rather it is a means for establishing vicarious liability for the underlying tort." *Halberstam, supra*, 705 F.2d at 479. Based on our review of the extensive record in this case, our past decisions (and those of the D.C. Circuit) regarding civil conspiracy, the legal principles applied by the trial court, and the court's careful and cogent analysis, we see no reason to disturb its grant of summary judgment to the mortgage defendants on plaintiffs/appellants' theory of conspiracy. The trial court did not make improper factual findings that should have been left for a jury's consideration. Rather the trial court correctly determined that plaintiffs/appellants did not present sufficient evidence to prove the elements of the alleged civil conspiracy. Moreover, on the record established to this point of the case, none of the tortious acts alleged by plaintiffs/appellants establishes vicarious liability on the part of the mortgage defendants for any underlying tort.

### Standing of the Condominium Association

Plaintiffs/appellants contend that the trial court "erroneously decided that the Condominium Association lacked standing to bring CPPA claims on behalf of its members because of the failure to demonstrate a[n] 'injury-in-fact.'" They claim that this decision contravenes an earlier ruling of Judge Hedge that the Association has standing to bring claims on behalf of its members for damage to the common areas of the condo building.

 To establish Article III constitutional standing,

> a plaintiff must show (1) it has suffered an "injury-in-fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citing *Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)). Moreover, "[a]n association has standing to bring suit on behalf of its members[:] [a] when its members would have standing to sue in their own right, [b] the interests at stake are germane to the organization's purpose, and [c] neither the claim asserted nor the relief requested requires individual members' participation in the lawsuit." *Id.* at

169, 120 S.Ct. 693; *see also Friends of Tilden Park, Inc. v. District of Columbia,* 806 A.2d 1201, 1207 (D.C.2002).

Ms. Saucier, the corporate designee for the Condominium Association, testified that the Association expended funds to repair common areas, and paid at least $58,000 for a new roof. Judge Hedge concluded that "each individual member [of the Association] shares a 2.38% interest in the Association," and therefore, "the individual plaintiff's alleged harm does not vary and there is no need for individualized proof for each plaintiff's damages." Furthermore, she declared, "[g]iven the Association controls the common areas, there is no danger of double recovery because the Association is not recovering for harm to the individual units." However, in his Saucier memorandum opinion, Judge Burgess declared that the Association failed to show an injury-in-fact and "does not meet associational standing requirements"; therefore, he granted "summary judgment to [m]ortgage [d]efendants with respect to all claims raised by the [A]ssociation, whether on behalf of its members or itself." [10]

 We conclude that the Association has established that it suffered an injury-in-fact through the testimony of its corporate designee as to the amount the Association paid for a new roof, and through the confirming statement of Mr. Boucher, the appraisal expert, that the Association paid approximately $60,000 to replace the roof.[11] The funds used to pay for the roof

---

10. The Association does not press a claim on its own behalf.

11. As early as 1971, this court decided to follow the constitutional Article III standing requirement. *See Apartment & Office Bldg. Ass'n of Metro. Wash. v. Washington,* 343 A.2d 323, 331 (D.C.1975) (citing *Basiliko v. District of Columbia,* 283 A.2d 816, 818 (D.C.1971));

*see also Grayson v. AT & T Corporation,* 15 A.3d 219, 233 (D.C.2011) (en banc) (although this court is an Article I court and we "are not bound by the requirements of Article III," we "ha[ve] followed the principles of standing, justiciability and mootness to promote sound judicial economy"; we also "ha[ve] recognized that an adversary system can best adjudicate real, not abstract, conflicts" (quot-

replacement came from fees paid to the Condo Association by unit owners. The sum paid represented a concrete, actual injury. *See Friends of the Earth, supra,* 528 U.S. at 180, 120 S.Ct. 693. The injury to the Association and its members is fairly traceable to information likely to have been known by the mortgage lenders but not disclosed to at least some of the plaintiffs/appellants prior to the closing on their mortgage loans, and the injury will be redressed if plaintiffs/appellants prevail on their § 28–3904(f) claim. In addition, plaintiffs/appellants have standing in their own right, and the repair and replacement of the condo building roof is germane to one of the Association's purposes, maintaining common areas of the condo building in good repair. And, as Judge Hedge found, the relief the Association is requesting does not require the participation of all of the condo owners. Therefore, we are satisfied that the Association has standing in this case.

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court regarding plaintiffs/appellants' common law fraud claim, its conspiracy claim, and its claim under D.C.Code § 28–3904(e). However, we vacate the trial court's judgment concerning the claim under § 28–3904(f), and its associational standing ruling, and we remand the case for trial on the subsection (f) claim.[12]

*So ordered.*

ing *District of Columbia v. Walters,* 319 A.2d 332, 337 n. 13 (D.C.1974))).

12. Presidential contends that the claims of Ms. Wilkerson and Ms. Bedney are time-barred because when they entered the case as parties at the time plaintiffs/appellants' second amended complaint was filed on February 28, 2008, the statute of limitations had expired. In a footnote to their reply brief, plaintiffs/appellants assert that Presidential has waived this argument because it failed to file a cross-appeal. Judge Burgess considered the statute of limitations issue, and he ruled that under the law of the case doctrine, Judge Zeldon had resolved the issue by concluding that the claims of Ms. Wilkerson and Ms. Bedney were not time-barred under *American Pipe and Construction Co. v. Utah,* 414 U.S. 538, 551, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974), the case on which Presidential relied. That case held that "at least where class action status has been denied solely because of failure to demonstrate that the class is so numerous that joinder of members is impracticable, the commencement of the original class suit tolls the running of the statute for all purported members of the class who make timely motions to intervene after the court has found the suit inappropriate for class action status." *Id.* at 552–53, 94 S.Ct. 756 (internal quotation marks omitted). Judge Burgess concluded that Judge Zeldon's ruling had finality and was the law of the case. Presidential failed to lodge an appeal regarding Judge Burgess's statute of limitations' ruling, and hence, we agree that Presidential has waived its argument concerning the statute of limitations.