**Robin FLOYD, et al., Appellants,**

v.

**BANK OF AMERICA CORPORATION, et al., Appellees.**

**No. 12–CV–591.**

District of Columbia Court of Appeals.

Argued March 12, 2013.
Decided July 11, 2013.

---

Joseph A. Hennessey, Bethesda, MD, for appellants.

Michael B. Miller, with whom Mark P. Ladner, Jessica Kaufman, New York, NY, and Ana–Maria Ignat, Washington, DC, were on the brief, for appellees.

Before THOMPSON and BECKWITH, Associate Judges, and FARRELL, Senior Judge.

THOMPSON, Associate Judge:

Appellants, Robin Floyd and Priscilla Fuller, appeal from the judgment of the Superior Court dismissing, for lack of standing, the action they brought pursuant to the District of Columbia Consumer Pro-

tection Procedures Act (the "CPPA").[1] Although we conclude that the allegations of appellants' Amended Complaint (the "Complaint") satisfied the concrete-injury-in-fact requirement of standing, we affirm the judgment of dismissal on the ground that the Complaint failed to state a claim upon which relief could be granted.[2]

## I. Background

Appellants are customers of Bank of America, N.A. (the "Bank"), who named, as defendants in their CPPA suit, the Bank, its holding company (Bank of America Corporation), and a number of the Bank's or holding company's non-bank subsidiaries[3] (together, the "appellees" or the "Bank appellees"). The Complaint centers on the allegation that the Bank furnishes its customers with what looks like a "U.S. [customer service] telephone number" (i.e., a "ten-digit, U.S.-exchange, domestic telephone number"), which, when dialed, sometimes results in the customer's connection to a call center physically located outside the United States (in Mumbai, India, for example). The Complaint avers that when such an overseas connection occurs, the foreign-call-center representative receives an electronic transmission of the customer's digitized financial records and passwords, "so that [the] overseas personnel can service [customers'] inquiries and questions." The Complaint alleges that such telephonic communications and electronic data transmissions are exposed to surveillance, interception, or seizure by the U.S. government, because "the Executive Branch of the U.S. Government is of the view that it has unhindered authority to gather overseas intelligence" and "has established scores of listening posts throughout the world for the purpose of intercepting electronic signals being transmitted overseas," and because "foreign companies cannot invoke the protections of U.S. law ... against Government intrusion into the [electronic data] of Bank of America's U.S. consumers."[4]

The Complaint further asserts that, "[g]enerally speaking, when a resident of the United States makes use of the international telephone exchange to place a telephone call to a foreign national overseas, that U.S. resident must dial '011' ..., a country code, [and] a city code," thereby "purposefully availing himself of ... an overseas communication system." By contrast, the Complaint asserts, when a person dials a U.S. telephone number like the Bank's ten-digit customer-service number, she "has a reasonable expectation that the person to whom [she] will be connected also resides in the United States" and "a reasonable expectation that [her] ... telecommunications, electronic passwords, and financial records will be kept secure from intrusion by the United States Government." According to the Complaint, customers dialing the customer-service telephone number "are not affirmatively notified that their [electronic data] have been transferred to a foreign

---

1. *See* D.C.Code §§ 28–3901 to –3913 (2001).

2. "[W]e may affirm the trial court's dismissal order 'on any basis supported by the record.'" *Wilburn v. District of Columbia,* 957 A.2d 921, 924 (D.C.2008).

3. These include non-bank subsidiaries located in India, the Philippines, Costa Rica, and Mexico.

4. In their brief opposing dismissal of their Complaint, appellants asserted *inter alia* that the federal Wiretap Act "bars the Government from intercepting ... communications within the United States in the absence of judicial sanction," but that this protection is forfeited when customer service calls and attendant financial records are transmitted to foreign nationals residing overseas (where, according to appellants, such communications may be "harvest[ed]" and searched "at will").

national residing overseas" or that the routing of their data overseas "will affect a forfeiture of consumer rights under the laws of the United States."

Describing their own interest in the matters described above, appellants asserted in the Complaint that:

> [Each of them], after dialing a U.S. telephone number to reach Bank of America, has been connected to a foreign national residing overseas. [Each] Plaintiff . . . has had at least one discussion with a customer service representative acting as an agent for Bank of America—a customer service representative who resides overseas. This customer service representative had access to Plaintiff['s] . . . financial records. Plaintiff . . . never provided her consent to having her [electronic data] transferred to a foreign national residing overseas and was never informed that by communicating with such foreign nationals overseas, she would forfeit all the U.S. law protection that protected her [electronic data] from intrusion by the Government.

The Bank appellees moved to dismiss the Complaint for lack of subject matter jurisdiction, arguing that appellants alleged no concrete injury and therefore lacked standing to maintain their suit. Alternatively, appellees sought dismissal on the ground that the Complaint failed to state a claim under the CPPA. The Superior Court dismissed the Complaint for lack of standing, concluding that appellants "have not sufficiently alleged an actual or imminent injury that is neither conjectural nor hypothetical" and "failed to allege a sufficient personal stake." Order at 6 (internal quotation marks omitted).[5] This appeal followed.

## II. Analysis

### A. Standing

 "[E]ven though Congress created the District of Columbia court system under Article I of the Constitution, rather than Article III, this court has followed consistently the constitutional standing requirement embodied in Article III," i.e., that "appellants must allege some threatened or actual injury resulting from putatively illegal action in order for [the District of Columbia courts] to assume jurisdiction." *Grayson v. AT & T Corp.*, 15 A.3d 219, 224 (D.C.2011) (en banc) (alterations and internal quotation marks omitted). Appellees contend that appellants have failed to allege an injury that is more than speculative because their Complaint makes no claim that the Government has actually accessed their account information or has actually intercepted communications in which they participated. Rather, appellees argue, the Complaint merely speculates that the Government "might be covertly stealing their financial information from Bank of America" and "contemplates what *might* happen to [them] *if, at some point,* the Government were able to and did steal [a]ppellants' account information from Bank of America." Thus, appellees argue, the Superior Court correctly ruled that appellants lack standing.[6]

---

5. Appellees had also argued that appellants failed to meet the Super. Ct. Civ. R. 23 requirements for bringing their lawsuit as a representative suit. The Superior Court did not reach that argument or appellees' argument that the Complaint failed to state a claim under the CPPA.

6. Appellees emphasize that similar claims about U.S. government surveillance and electronic data interception have been asserted in a number of lawsuits brought under the Right to Financial Privacy Act ("RFPA"), 12 U.S.C. § 3401, and have been dismissed for lack of standing on the ground that the plaintiffs "offer[ed] nothing more than subjective specula-

Reviewing the issue *de novo*, we disagree.[7] Our analysis in *Grayson* establishes that while "a lawsuit under the CPPA does not relieve a plaintiff of the requirement to show a concrete injury-in-fact to h[er]self," 15 A.3d at 244, she may make a showing of concrete injury in fact by alleging that she is a consumer of the defendant's service(s) and that the defendant has misrepresented material facts about the service or has failed to inform the plaintiff of material information about the service. *See id.* at 248–49. The particulars of *Grayson* illustrate the broad reach of our holding. "Significantly," we said, Grayson stated in his complaint that he "obtained and used prepaid calling cards in the District, the unused value of which [the defendants] have failed to report and pay to the Mayor[.]" *Id.* at 248. We described Grayson's claim that "[defendants'] failure to inform or to disclose to consumers who obtained their calling cards in the District the fact that they have retained breakage as profit, rather than reporting and turning it over to the District, as required by law, constitutes a material fact that tends to mislead, in violation of D.C.Code § 28–3904(f)." *Id.* We concluded that "Mr. Grayson alleges personal injury to himself, or injury in fact, based on the defendants' violation of his statutory right (derived from D.C.Code § 28–3904) to the disclosure of information...." *Id.* at 249. Thus, our conclusion that Grayson had standing did not depend on a claim that he was entitled to recover breakage amounts to redress claimed economic injury. Rather, it sufficed that he asserted "an invasion of his statutory legal right[ ] created by the CPPA," *id.* at 248–49, to truthful and non-misleading information regarding the fate of the value of unused minutes on the calling cards he had

tion that the Government obtained [or reviewed] their financial information." *Stein v. Bank of America Corp.*, 887 F.Supp.2d 126, 128, 130 (D.D.C.2012) (dismissing suit complaining about the transfer of Bank of America customer data to foreign-based call/data centers and the exposure of the data to the "pervasive, foreign intelligence gathering activities conducted by the National Security Agency"); *see also, e.g., Walker v. S.W.I.F.T. SCRL*, 517 F.Supp.2d 801 (E.D.Va.2007); *Amidax Trading Group v. S.W.I.F.T. SCRL*, 607 F.Supp.2d 500 (S.D.N.Y.2009). Appellees also draw our attention to the recent opinion in *Clapper v. Amnesty Int'l USA*, —— U.S. ——, 133 S.Ct. 1138, 1148, 185 L.Ed.2d 264 (2013) (holding that respondents lacked standing to challenge the constitutionality of a provision of the Foreign Intelligence Surveillance Act because they did not claim knowledge that their communications had been monitored and because it was "speculative whether the Government will imminently target communications to which respondents are parties").

Appellees urge us to follow the lead of these cases. Importantly, however, none of these lawsuits was decided under the CPPA (the plaintiffs in *Stein* "abandoned their CPAA claims," 887 F.Supp.2d at 129), which makes false or misleading representations to consumers in the context of commercial transactions actionable as unfair trade practices. As we have observed, the deprivation of the CPPA "statutory right to be free from improper trade practices may constitute an injury-in-fact sufficient to establish standing, even though the plaintiff would have suffered no judicially cognizable injury in the absence of the statute." *Grayson*, 15 A.3d at 249 (alterations and internal quotation marks omitted). Appellants' alleged injury based on violations of their rights under the CPPA is thus unaffected by the cases appellees cite. Because we find standing based on that alleged injury, moreover, we need not address any separate claim by appellants that they suffered an injury in fact based solely on a "forfeiture of rights" or "the loss of the *right* to exclude the U.S. Government from seizing and searching data and information," concerning which appellants offer no proof of actual intrusion by the government.

7. "Whether appellants have standing is a question of law which we consider on appeal *de novo.*" *Randolph v. ING Life Ins. & Annuity Co.*, 973 A.2d 702, 705 (D.C.2009) (internal quotation marks omitted).

purchased. As we noted, "[t]he basis for Mr. Grayson's standing and the manifestation of his alleged injury in fact" were similar to those in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), in which the Supreme Court determined that, because the Fair Housing Act "establish[ed] an enforceable right to truthful information concerning the availability of housing," *id.* at 373, 102 S.Ct. 1114 the plaintiffs had standing to sue where they alleged a " 'deprivation of information about housing availability.' " *Grayson*, 15 A.3d at 249.

For reasons similar to those we discussed in *Grayson*, we conclude in this case that the Complaint's assertions about ways in which the Bank appellees allegedly violated the CPPA satisfied the concrete-injury requirement for standing.[8] The Complaint alleged violations of several provisions of § 28–3904 of the CPPA, including subsections (a), (b), (d), (f), (s), and (t). Under subsection (a), it is a violation of the CPPA for "a 'person' connected with the 'supply' side of a consumer transaction"[9] to "represent that goods or services have … characteristics … that they do not have[.]" Appellants allege that the Bank appellees violated this provision by configuring the customer service phone

number in such a way that, when appellants made what they thought was a domestic call, their communications were routed to, and their account data were transmitted electronically to, overseas call centers that appeared to have, but actually lacked, a characteristic of U.S. call/data centers: "the characteristic that they are subject to the laws of the United States and can invoke the laws of the United States to bar Government intrusion into consumer [electronic data]."

Under § 28–3904(b), it is a violation to represent that a "person has a … status … that the person does not have[.]" Appellants allege that the Bank's customer-service phone number "create[s] the impression, and thus represents, that the foreign[-]national customer service representatives have the same status as U.S.-based customer service representatives," i.e., the status of "U.S. Persons" who "have the protection of and can invoke the laws of the United States to safeguard" [Bank] consumers' [electronic data] from Government intrusion." Under § 28–3904(d), it is a violation to "represent that … services are of particular standard … if in fact they are of another[.]" Appellants allege that this section is violated by the Bank's creating the impression that foreign-based

---

8. The Complaint does include at least one claim as to which we agree appellants lack standing. Appellants assert their belief that the Bank "has taken affirmative steps to disguise that it has transferred [telephone communications and financial data] to foreign nationals residing overseas" and has engaged in "active, deliberate misrepresentations." As the basis for these allegations, appellants rely on "[p]ublished reports indicat[ing] that foreign based call/data centers employ various devices in order [to] deceive U.S.-based consumers about the origin of the services they have reached," including "providing overseas call center operators with weather reports from the United States so that foreign-based customer service representatives can chat with U.S.-based consumers about the weather

in order for such U.S.-based consumers to believe that their customer service call has been fielded within the United States" and "equipping overseas call centers with up-to-date sports scores so that foreign-based customer service[ ] representatives can chat with U.S.-based consumers about the results of various sporting events in order to perpetuate the [same] false impression." Appellants "cannot demonstrate the requisite injury-in-fact for standing in our courts," *Grayson*, 15 A.3d at 246–47, by resting their claims of affirmative efforts at deceit entirely "on the legal rights or interests of third parties."

9. *Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 709 (D.C.1981).

customer service representatives operate "at the same standard as U.S.-based call/data centers" when in fact they "operate at a significantly lower standard" in that they "cannot invoke the protection of the laws of the United States to exclude the U.S. Government from unfettered access to consumer's financial records."

Under § 28–3904(f), it is an unfair trade practice to "fail to state a material fact if such failure tends to mislead[.]" The Complaint alleges that the Bank has violated this section of the CPPA by failing to inform customers about the "legal detriment incurred when customers communicate with foreign[-]national customer service representatives or foreign-based call/data centers." Under § 28–3904(s), it is a violation to "pass off goods or services as those of another[.]" The Complaint alleges that the Bank "pass[es] off the services of foreign national customer service representatives residing overseas and call/data centers located overseas for the services of customer service representatives operating within the United States and call/data center[s] located within the United States." Finally, under § 28–3904(t), it is a violation of the CPPA to "use deceptive representations or designations of geographic origin in connection with goods or services[.]" The Bank violated this provision, appellants allege, by directing them to a U.S. telephone number but transmitting calls made to that number to call/data centers located overseas.

■ Importantly, the "threshold issue of standing ... is not to be confounded with the question of whether appellants can prevail on the merits of their respective claims." *Grayson*, 15 A.3d at 224.

Under *Grayson*, what matters for standing under the CPPA is that appellants alleged that they are Bank consumers and that the Bank made misrepresentations and omissions in providing them information about its services they utilized. Like Mr. Grayson, appellants here "allege[ ] personal injury to [themselves], or injury in fact, based on the defendants' violation of [their] statutory right (derived from D.C.Code § 28–3904) to the disclosure of information," and their "factual allegations are sufficient to require the court to consider whether [they are] correct that the CPPA endows a consumer with a right to" the information they describe. *Id.* at 249, 249 n. 97. They have "alleged a sufficient personal stake" in that they claim to have "personally [engaged in] consumer transactions in which the ... information was not disclosed," which is sufficient "to oblige the court to determine whether [their] legal theory about the applicability of the CPPA is correct" and to give them "standing to have the court answer the merits question, even if the court would answer it in the negative." *Id.* at 249 n. 97 (internal quotation marks omitted).

### B. The Legal Sufficiency of Appellants' Claims Under the CPPA

■ In seeking dismissal of the Complaint for failure to state a claim, appellees advanced a number of reasons why appellants' CPPA claims must fail. We agree that each of the claims fails for one or more of the reasons appellees have identified or because, we have determined, appellants "legal theory about the applicability of the CPPA," *Grayson*, 15 A.3d at 249 n. 97, is *not* correct.[10]

"[A] complaint should not be dismissed because a court does not believe that a plaintiff will prevail on [his] claim"; rather, "[t]he only issue ... is the legal sufficiency of the

---

10. In considering whether to dismiss a complaint for failure to state a claim, we " 'accept the allegations of the complaint as true, and construe all facts and inferences in favor of the plaintiff[s].' " *Grayson*, 15 A.3d at 228.

■ We begin with appellants' claims that the Bank violated § 28–3904(a), (b), and (d) of the CPPA by representing that the services of the foreign call centers to which appellants were connected have "characteristics" and a "status" that they do not have, and that the call centers operate under the same standards as Bank call centers in the United States. We agree with appellees that the fatal defect in these claims is that appellants have not pointed to any representation(s) that the Bank made that was to the effect that, in providing customer service, every Bank call center representative can "invoke the protection of the laws of the United States to exclude the U.S. Government from unfettered access to consumers' financial records." The allegations in *Grayson* had a similar deficiency. Grayson alleged that the defendants who sold pre-paid telephone calling cards represented, in violation of § 28–3904(a), that their products had "benefits ... that they do not have." *Id.* at 251. We observed that "[t]he problem with Mr. Grayson's complaint is that it does not identify a representation by defendants about their calling cards that fits within this subsection." *Id.* at 251. For example, we said, "there is no averment that defendants affixed a notice to the calling card indicating that customers could talk for 30 more minutes than they paid for (when in reality they could not)" or that "if they failed to use all of their minutes within one, two or three years, the remaining amount would go to a District charity or the District government (but instead they counted the remaining minutes as profit)." *Id.* We concluded for that reason that the complaint "ha[d] not stated a legally viable claim under § 28–3904(a)." *Id.* We reach the same conclusion here.

We recognize that appellants' premise is that the Bank's provision of a ten-digit customer service number may reasonably be taken as a representation that the phone number will connect the caller with a customer service representative located in the United States, with whatever legal protections that location implies. Even accepting that premise *arguendo*,[11] we reject appellants' claim that the ten-digit number entails a representation, within the meaning of § 28–3904(a) and (d), about the "characteristics" and "standards" of the "services" the Bank will provide to consumers who dial the number. We think this claim stretches the meaning of those statutory terms beyond what the words can bear. The CPPA does not contain definitions of the terms "characteristics" and "standards," and this court has not previously construed these terms. However, the CPPA's definitional section, § 28–3901, does define the term "goods and services" to mean "any and all parts of the economic output of society, at any stage or related or necessary point in the economic process[.]" § 28–3901(7). In light of that definition, we conclude that when we consider whether the Complaint states a claim under the CPPA provisions pertaining to representations about the "characteristics" and "standard" of the Bank's "services," we must focus on whether it alleges misrepresentations about the Bank's "economic output." We conclude that the Complaint does not allege misrepresentations about the Bank's "economic output," but instead alleges a misrepresentation about other matters (i.e., the legal environment and the climate of surveillance), and therefore does not state a claim under § 28–

complaint." *Id.* at 228, 229 (internal quotation marks omitted).

11. We explain *infra* why we conclude that the ten-digit phone number is not a representation to that effect.

3904(a) and (d).[12]

We also note that language similar to the terms used in D.C.Code § 28–3901(a), (b), and (d) is used in California's Consumers Legal Remedies Act ("CLRA"), which prohibits, *inter alia,* representing that goods or services have characteristics which they do not have, representing that a person has a status which he or she does not have, and representing that goods or services are of a particular standard if they are of another. *See* Cal. Civ.Code § 1770(a)(5), (a)(7). In *Waters v. Advent Prod. Dev.,* No. 07cv2089, 2011 WL 721661, 2011 U.S. Dist. LEXIS 16989 (S.D.Cal. Feb. 22, 2011), the court reached a conclusion analogous to the one we reach here, holding that the plaintiff failed to state a claim under the foregoing CLRA provisions where he alleged that the defendant company entered into a contract with him without disclosing that it had failed to register to do business with California's Secretary of State, failed to register an agent for service of process, and failed to obtain a bond as required by a provision of the Cal. Bus. & Prof.Code. *Id.* at *6, 2011 U.S. Dist. LEXIS 16989 at *15. The court reasoned that the defendant's "failure to comply with business requirements does not constitute a violation of the above-quoted provisions," because whether it "was a business in good standing in California and/or was compliant with all business requirements does not bear upon the issue of whether [it] made misleading representations *regarding its services.*" *Id.* at *6, 2011 U.S. Dist. LEXIS 16989 at *16 (emphasis added). The court declined to "distort the meaning of the CLRA to encompass Plaintiffs' claims." *Id.* at *6–7, 2011 U.S. Dist. LEXIS 16989 at *16–17. Similarly, we will not distort the meaning of § 28–3904(a), (b), and (d) to encompass appellants' claims about the susceptibility of their Bank account data to government surveillance.

■ We next consider appellants' claim brought under § 28–3904(f), a broader provision that declares it to be a violation of the CPPA to "fail to state a material fact if such failure tends to mislead." To recap, appellant's claim is that the Bank appellees failed to inform appellants "about the legal detriment incurred when [they] communicate with foreign[-]national customer service representatives or foreign-based call/data centers," that alleged detriment being "a forfeiture of consumers' right to be free of Government intrusion into [electronic data]." We conclude that this allegation fails to state a claim for two reasons. First, § 28–3904(f) makes it an unfair trade practice to fail to state a material "fact." The understanding appellants describe about the inapplicability of U.S. legal protections to overseas transmittals of Bank-customer account information is a *legal assessment* of the implications of the Bank's use of overseas call

---

12. *Cf. Saucier v. Countrywide Home Loans,* 64 A.3d 428, 441, 442 (D.C.2013) (holding that the defendant mortgage lender's statement that the plaintiffs' FHA loan applications had been approved was not actionable because there was no dispute that the lender had in fact approved the loans, and because, even if accurate, plaintiffs' allegations that the lender "ignored and failed to comply with the FHA conditions and safeguards that were required for that approval" did not make the statement one that "ha[d] a tendency to mislead" within the meaning of CPPA § 28–3904(e) (internal quotation marks omitted)); *Athridge v. Aetna Cas. & Sur. Co.,* 351 F.3d 1166, 1177 (D.C.Cir.2003) (holding that Aetna's failure "to disclose facts that suggested the Superior Court might not have subject matter jurisdiction" and "failed to disclose to [the putatively insured consumer] that he was entitled to remove the [insurer's] declaratory action to federal court" were not actionable under the CPPA as omissions that tended to mislead, because the court could not "imagine that the District of Columbia legislature intended such a result").

centers,[13] not a *fact*.[14] *Cf. Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (cautioning against courts' acceptance of " 'a legal conclusion couched as a factual allegation' " for the purpose of evaluating whether a complaint fails to state a claim) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

Second, we have explained that "an omission is material if a significant number of unsophisticated consumers would find that information important in determining a course of action." *Saucier v. Countrywide Home Loans*, 64 A.3d 428, 442 (D.C. 2013) (internal quotation marks omitted). Applying a similar articulation of that principle in *Grayson*, we reasoned that plaintiff Grayson had failed to state a claim for a violation of § 28–3904(f) because there was "no showing ... that a reasonable consumer would consider [the omitted] information about how a phone company treats breakage to be material to the decision to purchase a calling card from that company." 15 A.3d at 251. In this case, appellant's § 28–3904(f) claim focuses on the *Bank's* legal assessment about the loss of legal protections for customer data transmitted overseas. Importantly, appellants do not allege that the U.S. government has demanded or obtained customer account information from the Bank's overseas call/data centers, such that one or more of the Bank defendants has gained special insight or knowledge, not generally held by or available to others, about government efforts to access or success in accessing customer data. For that reason, we are given no reason to think (and we reject, as a matter of law, the contention) that "a significant number of unsophisticated consumers" would consider it important, in making a decision about whether to seek assistance by using the Bank's customer service telephone number, to have the *Bank's* (non-expert) assessment about the level of exposure of account information made available electronically to the Bank's overseas customer-service representatives to U.S. government surveillance. We therefore conclude that the omitted information was not "material" within the meaning of § 28–3904(f).[15]

Appellants' claim based on § 28–3904(s) fares no better. Appellants say that § 28–3904(s) is implicated because, allegedly, the Bank "pass[ed] off goods or services [provided by its foreign call centers] as those of another[.]" In their Motion to Dismiss, appellees argued that both U.S.-based call centers and overseas call centers "provide *Bank of America* customer service" and thus that there is no basis for a claim that the overseas call centers have been passed off as "services of another." Appellees also argued that "considering that [the] widespread corporate use of overseas call centers in today's global economy" is both "subject to frequent media coverage" and "fodder for nationally syndicated sitcoms and commercials," no

---

**13.** We note that appellees challenge that assessment. They assert, for example, that "courts have not questioned the applicability of the RFPA in cases where the Government seeks customer information that is transmitted internationally, presumably to the custody of foreign nationals."

**14.** *Cf. Miller v. Pac. Shore Funding*, 224 F.Supp.2d 977, 989 (D.Md.2002) (holding that because the defendant's "failure to disclose [plaintiffs'] rights under the [Maryland Secondary Mortgage Loan Law] does not constitute a failure to disclose a material fact," plaintiffs' complaint "failed to state a claim that [defendant] violated the [Maryland Consumer Protection Act]").

**15.** We so conclude even while taking appellants at their word that had *they* been afforded the Bank's (putative) assessment, they would have taken action to prevent their data from being transmitted overseas.

consumer could have an objectively reasonable "expect[ation] that calling a toll-free or domestic customer service number provided by the bank necessarily entails speaking with a customer service representative in the United States." [16] We are persuaded by both arguments and therefore conclude that appellants have failed to state a claim under § 28–3904(s). The second of the arguments also leads us to conclude as a matter of law that merely by providing appellants with a ten-digit domestic-looking telephone number for customer service, appellees did not "use deceptive or representations or designations of geographic origin in connection with goods or services" within the meaning of § 28–3904(t).

## III. Conclusion

For the foregoing reasons, we conclude that appellants' Complaint failed to state a claim under the CPPA. Accordingly, the Superior Court's judgment of dismissal is

*Affirmed.*

16. Appellees point out, and we take judicial notice, that calls can be made to Canada and most Caribbean nations by dialing a ten-digit number without dialing a 011 exchange, and thus that it is not true that the indispensable feature of an international call is that the caller must dial 011 (and a total of more than ten digits). We also note that case law reflects that with modern communications technologies, there can be a " 'loss of geographic identity of one's telephone number.' " *United States Telecom Ass'n v. FCC*, 400 F.3d 29, 37 (D.C.Cir.2005). For example, with the advent of Voice over Internet Protocol ("VoIP"), "communications originate and terminate at IP addresses which exist in cyberspace, but are tied to no identifiable geographic location," with the result that "the geographic location of the VoIP part of the call could be anywhere in the universe the VoIP customer obtains broadband access to the Internet, not necessarily confined to the geographic location associated with the customer's billing address or assigned telephone number," and "VoIP customers can choose ... area codes different from those associated with their billing addresses." *Minnesota Pub. Utils. Comm'n v. FCC*, 483 F.3d 570, 574–75 (8th Cir.2007).