*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 20-CV-392 & 20-CV-530

CENTER FOR INQUIRY INC., APPELLANT,

V.

WALMART, INC., APPELLEE.

and

CENTER FOR INQUIRY INC., APPELLANT,

V.

CVS PHARMACY, INC., APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(CAB-3340-19 & CAB-4698-18)

(Hon. Florence Pan, Motion Judge)
(Hon. Fern Flanagan Saddler, Motion Judge)

(Argued January 13, 2022     Decided September 29, 2022)

*Nicholas J. Little* for appellants.

*Christina G. Sarchio*, with whom *Matthew H. Kirtland*, *Jeffrey B. Margulies*, and *Katherine G. Connolly*, were on the brief, for appellee Walmart, Inc.

*Jeanne M. Gills*, with whom *Lauren A. Champaign*, was on the brief, for appellee CVS Pharmacy, Inc.

Before BECKWITH, and EASTERLY, *Associate Judges*, and THOMPSON,[*] *Senior Judge.*

THOMPSON, *Senior Judge*:  In these consolidated appeals, plaintiff/appellant Center for Inquiry, Inc. ("CFI") seeks review of orders of the Superior Court dismissing its complaints against Walmart, Inc. ("Walmart") (appeal no. 20-CV-0392) and CVS Pharmacy, Inc. ("CVS") (appeal no. 20-CV-0530), alleging violations of the District of Columbia Consumer Protection Procedures Act (the "CPPA" or the "Act").  *See* D.C. Code §§ 28-3901 to 28-3913.  Each complaint alleged that the defendant retailer's in-store and online product placement, along with aisle signage (e.g., "Cold, Cough & Flu Relief"), falsely present homeopathic products as equivalent alternatives to "science-based" medicines and falsely represent that homeopathic products are effective in treating or relieving specific diseases and symptoms.  Each of the complaints was dismissed upon a finding that CFI lacked standing to bring suit and failed to state a claim upon which relief could be granted.  For the following reasons, we reverse and remand.

---

[*] Judge Thompson was an Associate Judge of the court at the time of argument.  She began her service as a Senior Judge on February 18, 2022.

## I.  Background

The complaints state that plaintiff/appellant CFI is a non-profit organization whose "mission is to foster a secular society based upon science, reason, freedom of inquiry, and humanist values."  According to the complaints, CFI envisions a "world where people value evidence and critical thinking, where superstition and prejudice subside, and where science and compassion guide public policy."  The complaints allege that homeopathy is a pseudoscience and that the concepts on which it is based "contradict the most fundamental understanding of science[.]"

On July 17, 2018, CFI filed its First Amended Complaint against CVS, seeking declaratory, injunctive, and monetary relief based on its allegations that the retailer violated the CPPA by falsely presenting homeopathic products as equivalent alternatives to "science-based" medicines through its manner of marketing, labeling, and placing the products in its physical stores and online.  On August 5, 2020, the Superior Court (the Honorable Fern Flanagan Saddler) granted CVS's motion to dismiss the complaint, reasoning that CFI lacked standing because it failed to show that it is a "nonprofit organization" or "public interest organization" within the meaning of the CPPA, specifically, D.C. Code § 28-

3905(k)(1)(C)-(D). Regarding whether CFI is a non-profit organization, Judge Saddler found that CFI did not "sufficiently allege[] that its members or organizational activities have been harmed" by CVS's allegedly unlawful trade practices. Regarding whether CFI is a public interest organization, Judge Saddler found that CFI's mission and organizational purpose did not demonstrate that it was organized and operating for the purpose of promoting interests or rights of consumers and further that CFI, which alleged that its suit was on behalf of the general public rather than on behalf of a class of consumers, did not allege a sufficient nexus to consumers. Judge Saddler also concluded that the complaint failed to state a claim, reasoning that she did not find CVS's marketing and product placement regarding homeopathic products "to be an actionable representation, or to have the tendency to mislead under the CPPA." She faulted CFI for "fail[ing] to cite to any pertinent scientific studies or legal authority . . . that placing homeopathic products next to 'science-based' medicines . . . is misleading to a reasonable consumer." Judge Saddler noted, with respect to the homeopathic products pictured in CFI's complaint, that "homeopathic" appears on the front of the boxes, which also had labels indicating their "Uses" and included federally mandated statements that the products had not been evaluated by the FDA. Upon that "unambiguous" labeling, Judge Saddler could not "find that a jury would find

that a reasonable consumer would be mislead [sic] by [CVS's] marketing and product placement[.]"

On May 20, 2019, CFI filed a complaint against Walmart that is almost identical to its (first amended) complaint against CVS. Walmart moved to dismiss on the grounds of lack of standing, failure to state a claim, and the primary jurisdiction doctrine. In May 2020, the Superior Court (the Honorable Florence Y. Pan) granted Walmart's motion. Like Judge Saddler, Judge Pan reasoned that CFI does not qualify as a public interest organization because it is not "organized and operating . . . for the purpose of promoting interests or rights of consumers." Judge Pan also found that CFI failed to allege that it was suing on behalf of a consumer or class of consumers and thus did not allege a sufficient nexus to consumers. Also like Judge Saddler, Judge Pan further found that CFI lacked non-profit organization standing because it did not allege that its organizational activities had been harmed by Walmart's product-placement practices with respect to homeopathic items or that any of CFI's members had been harmed by Walmart's product placement.[1] In addition, Judge Pan found that the complaint failed to state a claim, rejecting CFI's theory that through its product placement, Walmart makes

---

[1] CFI does not challenge on appeal Judge Saddler's and Judge Pan's rulings that it lacks nonprofit-organization standing under § 28-3905(k)(1)(C).

a "representation" about the efficacy of the homeopathic drugs or implies that "homeopathic drugs are as effective as the science-based drugs that are shelved nearby."[2]

CFI timely appealed from both judgments of dismissal, and we granted a motion to consolidate the appeals. This court reviews de novo the dismissal of a complaint for lack of standing. *Equal Rts. Ctr. v. Properties Int'l*, 110 A.3d 599, 603 (D.C. 2015). We also review de novo a dismissal for failure to state a claim. *Grayson v. AT&T Corp.*, 15 A.3d 219, 229 (D.C. 2011) (en banc).

## II. Applicable Law

The CPPA provides that "[i]t shall be a violation of this chapter for any person to engage in an unfair or deceptive trade practice, whether or not any

---

[2] Judge Saddler did not reach CVS's argument that CFI's claims fail under the doctrines of preemption and primary jurisdiction, and Judge Pan did not reach Walmart's argument, made with reference to the FDA's then-current evaluation of its regulatory framework for homeopathic products, based on primary jurisdiction. Neither CVS nor Walmart presses these arguments on appeal (with Walmart explaining that the FDA subsequently changed its focus). We therefore have no occasion to address those arguments.

consumer is in fact misled, deceived, or damaged thereby, including [as pertinent here] to "(a) represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have;" "(d) represent that goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another;" "(e) misrepresent as to a material fact which has a tendency to mislead;" "(f) fail to state a material fact if such failure tends to mislead;" and "(f-1) use innuendo or ambiguity as to a material fact, which has a tendency to mislead[.]"  D.C. Code § 28-3904(a), (d), (e), (f), (f-1).[3]

D.C. Code § 28-3905(i)(3)(B) provides that a complainant may sue in the Superior Court when any violation of the CPPA has occurred.  In 2012, the Council of the District of Columbia (the "Council") amended the CPPA, enacting two new subsections governing who may sue under the Act, including

---

[3] CFI's complaints cite § 28-3904(b), but the parties agree that the citation was mistaken and that CFI intended to assert a violation of § 28-3904(d).  CFI's complaints also alleged a violation of § 28-3904(u) (making it a violation to "represent that the subject of a transaction has been supplied in accordance with a previous representation when it has not").  Judge Saddler dismissed the § 28-3904(u) claim outright, finding no pertinent factual allegations.  Judge Pan dismissed this claim as well for the same reasons.  CFI has not specifically challenged that ruling in either case.  Walmart asserts that CFI is not appealing dismissal of that claim and, in its reply brief, CFI does not contest the point.  Accordingly, we do not disturb the dismissals as they affect the § 28-3904(u) claim.

§ 28-3905(k)(1)(D). Subsection (k)(1)(D) authorizes CPPA suits by "public interest organization[s]," defined as "nonprofit organization[s] . . . organized and operating, in whole or in part, for the purpose of promoting interests or rights of consumers." D.C. Code § 28-3901(a)(15). In pertinent part, subsection (k)(1)(D) provides that:

> (i) [A] public interest organization may, on behalf of the interests of a consumer or a class of consumers, bring an action seeking relief from the use by any person of a trade practice in violation of a law of the District if the consumer or class could bring an action . . . for relief from such use by such person of such trade practice.

> (ii) An action brought under sub-subparagraph (i) of this subparagraph shall be dismissed if the court determines that the public interest organization does not have sufficient nexus to the interests involved of the consumer or class to adequately represent those interests.

D.C. Code § 28-3905(k)(1)(D)(i)-(ii).

## III.    Analysis

### A.    Standing

Our review of the Superior Court's lack-of-standing analysis is informed by our recent opinion in *Animal Legal Defense Fund v. Hormel*, 258 A.3d 174 (D.C.

2021) ("*ALDF*"). In *ALDF*, the plaintiff organization had as its "core mission" "protect[ion of] the lives and advance[ment of] the interest of animals" rather than the interest of consumers. *Id.* at 179. Its CPPA suit alleged that defendant Hormel's "Natural Choice" advertising campaign "misleads consumers into believing that the animals slaughtered to make Natural Choice deli meats were treated humanely, even though they were not." *Id.* at 180. In concluding that ALDF had standing to bring suit under the CPPA as a public interest organization, we rejected the narrow approach toward standing that Walmart and CVS suggest is required. We explained that in the 2012 amendments to the CPPA, the Council intended to confer maximum standing for public interest organizations, "beyond what would be afforded in a federal case under a narrow reading of prior federal court decisions on federal standing." *Id.* at 184 (quoting Consumer Protection Act of 2012, Report on Bill 19-0581 ("Committee Report"), at 6 (Nov. 28, 2012)). We added that "the Council intended public interest organizations bringing suit under (k)(1)(D) to be free from any requirement to demonstrate their own Article III standing." *Id.* at 184.

We recognized in *ALDF* that to have standing under § 28-3905(k)(1)(D), ALDF had "to check three boxes: (1) it must be a public interest organization [under the definition quoted *supra*], (2) it must identify 'a consumer or a class of

consumers' that could bring suit in their own right, and (3) it must have a 'sufficient nexus' to those consumers' interests 'to adequately' represent them." *Id.* at 185 (citations omitted). We concluded that ALDF "checks all three boxes." *Id.* With regard to the first "box," we were satisfied that ALDF is a nonprofit "'organized and operating,' at least in part, 'for the purpose of promoting interests or rights of consumers,'" because "providing consumers with accurate information about how their meat is sourced [so as to reduce demand for factory-farmed meat products] is one of its subsidiary purposes," and because "for more than a decade, [ALDF] had undertaken 'substantial efforts to ensure consumers have accurate information about how their meat is sourced,' including by 'undertaking investigations, filing regulatory actions, and bringing or participating in other legal challenges.'" *Id.* at 179, 185. We said that the fact that ALDF "advocates on behalf of consumers only in service of [its] predominant purpose of promoting animal welfare [was] not fatal to its suit." *Id.* at 186. As to the second "box," we were satisfied that ALDF adequately identified the class of consumers it sought to represent as District of Columbia consumers who "have been or will be misled, by Hormel's Natural Choice ads." *Id.* at 186. The fact that ALDF "additionally sought to maintain its suit on behalf of the general public" did "not diminish the sufficiency with which it identified the class of consumers[.]" *Id.* at 186-87.

Regarding the § 28-3905(k)(1)(D)(ii) "nexus" requirement, we explained that this requirement "functions to ensure that an 'organization has a sufficient stake in the action' to pursue it 'with the requisite zeal and concreteness.'" *Id.* at 187 (quoting Committee Report, at 6). We were satisfied that ALDF had a sufficient stake, noting that no one had "questioned its aptitude or zeal in prosecuting" its CPPA suit and that ALDF had "long sought" to educate consumers about factory farming conditions and practices "with the intended result of reducing demand" for factory-farmed meat. *Id.* at 187. We found "nothing inconsistent about seeking to eliminate meat consumption while ensuring meat eaters have accurate information available to them when making their purchasing decisions," given that "ALDF views the latter as a means to, or at least an incremental step toward, the former." *Id.* All told, we said, ALDF was "in sufficient alignment" with a class of meat-eating consumers. *Id.*

The complaints and the record here enable us to say much the same about CFI. CFI's Mission Statement (attached to Walmart's motion to dismiss as support for its "factual challenge" to CFI's standing) states inter alia that CFI "strives to foster a society free of . . . pseudoscience." CFI's complaints aver that CFI has "long worked to counter the negative impact of pseudoscientific alternative medicine upon society" and, as noted above, assert in particular that "homeopathy

is a pseudoscience." Appellee Walmart acknowledges CFI's "longstanding opposition to homeopathy, which it views as a pseudoscience," and appellee CVS refers to CFI's "multi-year mission to remove homeopathic drugs from the market." CFI's mission-driven opposition to homeopathy as a pseudoscience and CFI's efforts to remove homeopathic drugs from the market show that, at least in part, CFI both is organized and operates to promote the interests of those who would be consumers of "ineffective" homeopathic products.[4] The complaints describe, as what we think can be fairly described as one of CFI's subsidiary purposes, "ensur[ing] that labeling and marketing materials properly inform customers of the nature of [homeopathic] products," in service of CFI's larger goal of discouraging reliance on pseudoscience and pseudoscientific products.

---

[4] Quoting *Sierra Club v. Morton*, 405 U.S. 727, 740 (1972), Walmart argues CFI "should not be permitted to co-opt the CPPA to do nothing 'more than vindicate [its] own value preferences through the judicial process.'" But as the Supreme Court has explained, the reason an organization's mere abstract interest in a problem is insufficient to satisfy constitutional standing requirements is that "an organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art. III." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976). In enacting § 28-3905(k)(1)(D), the Council "convey[ed] a clear legislative intent to modify Article III's strictures," *ALDF*, 258 A.3d at 179, "with a more expansive statutory test." *Id.* at 183 (observing that "(k)(1)(D) would be pointless if it incorporated Article III's restrictions"). If an entity such as CFI meets the CPPA statutory test governing public interest organization standing, it has standing to sue "without regard to whether it also satisfies traditional Article III standing requirements." *Id.*

Further, CFI's complaints adequately identify the class of consumers it seeks to represent as District of Columbia customers to whom Walmart or CVS markets homeopathic products. The complaints allege that both retailers market homeopathic products to residents of the District of Columbia and that the retailers' product-placement practices "violate[] D.C customers' 'enforceable right to truthful information from merchants about consumer goods and services that are or would be purchased . . . in the District of Columbia.'"[5] The fact that the complaints state that CFI brought suit "on behalf of the general public" does not undermine that conclusion. *See ALDF*, 258 A.3d at 186-87. Finally, whether appellees' challenge to CFI's standing is viewed as facial or factual, we are satisfied that CFI both has, and has alleged, a sufficient stake in this CPPA action to pursue it zealously. The complaints aver that CFI has "long worked" to ensure that [homeopathic] products are effectively tested to ensure consumer safety; to ensure that manufacturers and retailers are prevented from making claims as to the products' effectiveness without scientific evidence to support such claims; and to ensure that labeling and marketing materials properly inform customers of the nature of the products. The complaints further aver that CFI has "worked diligently" to promote accurate labeling and marketing of homeopathic products and has petitioned the government to better and more effectively regulate the trade

---

[5] CFI did not need to allege that "its members shop at Walmart" or at CVS.

in such products in the United States, including by submitting comments to the Food and Drug Administration ("FDA") and Federal Trade Commission ("FTC") regarding the regulation, testing, marketing, and labeling of homeopathic products. As CVS and Walmart acknowledge, beginning more than a decade ago, CFI has petitioned the FDA and the FTC for stricter regulations on homeopathic drugs with respect to testing, marketing and labeling. These activities "align with consumers' interests." *ALDF*, 258 A.3d at 187. It is not fatal to CFI's standing that, as Walmart asserts, CFI may not be known as a "champion of consumer rights." And while CFI has not shown a nexus to or relationship with any particular consumers, the statute makes it enough that CFI has a "nexus to the *interests* involved of the consumer" so as "to adequately represent those interests."[6] § 28-3905(k)(1)(D)(ii). For all the foregoing reasons, we conclude that CFI has standing.

---

[6] A letter to CFI from the FDA that Walmart attached to its motion to dismiss shows that as early as 2011, CFI urged the agency to warn the manufacturer of the homeopathic drug Oscillococcinum to cease misleading advertising about the drug and to require the manufacturer to list the ingredients of Oscillococcinum in plain English on the manufacturer's website and on the product label.

## B.    Failure to State a Claim

As described above, the Superior Court found that CFI's complaints failed to state a claim because appellees' product-placement practices regarding homeopathic products do not constitute an actionable "representation" as to efficacy and (as stated in the order dismissing the complaint against CVS) because the practices do not "have the tendency to mislead under the CPPA."[7]  We disagree with the first of those rationales and conclude as to the second that whether the complained-of practices have a tendency to mislead reasonable consumers is a jury question.

To survive a motion to dismiss for failure to state a claim, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," and the "factual allegations must be enough to raise a right to relief above the speculative level." *Bereston v. UHS of Del., Inc.*, 180 A.3d 95, 99 (D.C. 2018) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (brackets omitted).  "A claim has facial plausibility when the plaintiff pleads

---

[7] Walmart likewise asserts that CFI's assertion that product placement is a representation about effectiveness is without support and is conclusory.

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To permit such an inference, the factual allegations must "nudge[] [the plaintiff's] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. In reviewing whether dismissal of a complaint was warranted, "we accept the allegations of the complaint as true, and construe all facts and inferences in favor of the plaintiff." *Grayson v. AT&T Corp.*, 15 A.3d 219, 229 (D.C. 2011) (en banc).

"[N]aked assertion[s] devoid of further factual enhancement" will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Still, at the pleading stage, a plaintiff's burden "is not onerous." *Poola v. Howard Univ.*, 147 A.3d 267, 276 (D.C. 2016) (internal quotation marks omitted). The issue presented by a motion to dismiss "is not whether [the] plaintiff will ultimately prevail but whether [it] is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Twombly*, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.") (internal quotation marks omitted).

As to the Superior Court's first rationale for dismissal — no actionable "representation" through product placement and associated signage — we hold as a matter of law that the placement of a product can be a representation within the meaning of the CPPA.  In reaching this conclusion, we rely on a couple of factors.  First, although the CPPA does not contain a definition of the term "represent," its definitional section and § 28-3904 evince a legislative intent to include, within the reach of the consumer-protection statute, deceptive representations that do not entail verbal communications.[8]  The definitional section, § 28-3901, defines "trade practice" to mean "any act which does or would . . .  provide information about . . .  consumer goods or services."  § 28-3901(a)(6).  Thus, "acts," not just words or statements, fall within the scope of the unfair or deceptive "trade practice[s]" prohibited by the CPPA.  Further, § 28-3904 includes within its list of "unfair or deceptive trade practice[s]" the use of "innuendo or ambiguity as to a material fact, which has a tendency to mislead[,]" D.C. Code § 28-3904(f-1), terms that convey an intent to include within the reach of the Act practices that convey information by implication.  Moreover, because the CPPA is a remedial statute, it must "be construed and applied liberally to promote its purpose."  *Saucier v. Countrywide*

---

[8] *See James Parreco & Son v. D.C. Rental Housing Comm'n*, 567 A.2d 43, 46 (D.C. 1989) ("[T]he intent of the legislature is found in the words used.").

*Home Loans*, 64 A.3d 428, 442 (D.C. 2013). Construing the Act to include allegedly misleading product placement within its scope is consistent with our recognition of the statute's remedial goals.

Second, we have recognized that "consumer protection laws tend to share common principles across the country," *Stone v. Landis Constr. Co.*, 120 A.3d 1287, 1291 & n.9 (D.C. 2015) (concluding that loss of potential employment was not actionable under the CPPA in part because, "virtually without exception, courts in other jurisdictions have rejected arguments that their consumer protection statutes encompass employment"), and we have looked to courts' interpretations of state consumer-protection statutes in construing the CPPA. *See Saucier*, 64 A.3d at 444. It is therefore pertinent that courts have construed state consumer-protection statutes to reach practices such as product placement, misleading imagery, and other non-verbal cues. For example, in *In re Dollar Corp.*, No. 16-02709, 2017 U.S. Dist. LEXIS 144316 (W.D. Mo., Aug. 3, 2017), plaintiffs brought suit under various State consumer-protection statutes,[9] alleging that the

---

[9] *See id.* at *21-24. These included provisions of the Arkansas Deceptive Trade Practices Act, the California Consumer Legal Remedies Act, the Colorado Uniform Deceptive Trade Practices Act, the Illinois Consumer Fraud and Deceptive Business Practices Act, the Maryland Consumer Protection Act, the Michigan Consumer Protection Act, the Minnesota Uniform Deceptive Trade Practices Act, the Nebraska Uniform Deceptive Trade Practices Act, the Ohio

defendant sold obsolete motor oils to unsophisticated customers by purposefully placing the motor oils on its shelves next to non-obsolete motor oils and that "this marketing scheme deceptively induced these customers into buying a worthless product that would likely damage their vehicles." *Id.* at *76-77. The federal district court denied the defendants' motion to dismiss "for failure to recite a cognizable deceptive practice," holding that "plaintiffs' claims based on state consumer protection acts are sufficiently pleaded and survive[.]" *Id.* at *90.[10] The

---

Consumer Sales Practices Act, and the Texas Deceptive Trade Practices Consumer Protection Act, each of which, in language similar to the CPPA language in D.C. Code § 28-3904(a), declares that it is an unfair trade practice to "represent[] that goods . . . have benefits . . . which they do not have" (or language to the same effect). *See* Ark. Code Ann. § 4-88-107(a)(1); Cal. Civ. Code § 1770(a)(5); Colo. Rev. Stat. § 6-1-105(1)(e); 815 Ill. Comp. Stat. § 510/2(a)(5); Md. Code Ann. § 13-301(2)(i); Mich. Comp. Laws Ann. § 445.903(1)(c); Minn. Stat. § 325D.44(5); Neb. Rev. Stat. § 87-302(a)(5); Ohio Rev. Code Ann. § 1345.02(B)(1); Tex. Bus. & Com. Code Ann. § 17.46(b)(5).

[10] CFI cites a number of trademark-infringement cases recognizing that product placement has the potential to influence consumer choice. *1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 411 (2d Cir. 2005) ("[A] drug store typically places its own store-brand generic products next to the trademarked products they emulate in order to induce a customer who has specifically sought out the trademarked product to consider the store's less-expensive alternative."); *Hershey Co. v. Promotion in Motion, Inc.*, No. 07-CV-1601 (SDW), 2013 U.S. Dist. LEXIS 203743, at *69 n.44 (D.N.J. Jan 18, 2013) ("product placement may influence consumers' ability to distinguish brands" in retail stores); *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 130 (2d Cir. 2009) (a display arranged to deceive consumers into buying an off-brand product while thinking they bought a famous brand would not "escape liability merely because it could claim the mantle of 'product placement'").

court so concluded even though the back labels on the products stated that the oil "is not suitable for use in most gasoline powered automotive engines built after 1988." *Id.* at *20.

Similarly, in *Youngblood v. CVS Pharm.*, No. 2:20-cv-06251, 2020 U.S. Dist. LEXIS 222032 (C.D. Cal. Oct. 15, 2020), the court reasoned that defendant CVS's packaging of its Infants' Acetaminophen product, which featured a picture of a mother and baby without any express disclosure that the medicine in the bottle is exactly the same as CVS's lower-priced Children's Acetaminophen product, "could lead a significant portion of the general consuming public or of parents of infants and children under two years old, to conclude [incorrectly] that Infants' is unique or specially formulate[d] for children under two." *Id.* at *9-10.  The court was "unable to conclude as a matter of law that no reasonable consumer would be deceived" and held that "CVS's theory that all [p]laintiffs' claims fail as a matter of law is meritless." *Id.* at *13.  The court so determined even though the Infant acetaminophen package "disclose[s] 'ACETAMINOPHEN 160 mg/5 mL,'" thereby "communicat[ing] that the medicine is the same as the medicine in the Children's Product." *Id.* at *10-11; *see also State v. Am. Recycling Techs., Inc.*, No. CV040832985, 2009 Conn. Super. LEXIS 1194, at *7-8 (Conn. Super. Ct. May 5, 2009) (reasoning that charitable logos on the sides of bins used to deposit

donated clothing items "clearly [but misleadingly] convey the overall message to donors that the clothing placed in the bins will go to support the charity pictured," an "implied representation" (that the donated items will be used to benefit a charitable organization) that was actionable under the Connecticut Unfair Trade Practices Act). The court so found even though the bins contained a disclaimer, in very small print, that while "[t]he owner of this unit makes a guaranteed yearly royalty payment to the name on the front of this container, . . . [a]ll proceeds go to the unit owner." *Id.* at *3. We discern no reason why appellees' placement of homeopathic products — like shelf placement, pictures, and logos — could not similarly convey information about effectiveness or equivalence. Accordingly, we conclude, product placement and associated signage can be actionable representations or innuendo.

The remaining issue is whether CFI has adequately stated a claim that appellees' product-placement practices involved in this case — CVS's and Walmart's placement of homeopathic products alongside other "science-based medicines" in the pharmacy sections of their stores — "have the tendency to mislead under the CPPA." The Superior Court found as a matter of law that CFI's tendency-to-mislead allegations were implausible. Walmart and CVS argue in addition that CFI's tendency-to-mislead allegations are conclusory and that the

complaints are devoid of supporting factual allegations to make CFI's claims plausible.[11]  We disagree.

To determine whether a complaint states a plausible claim under the CPPA, we must "consider an alleged unfair practice 'in terms of how the practice would be viewed and understood by a reasonable consumer.'"  *Saucier*, 64 A.3d at 442 (quoting *Pearson v. Chung*, 961 A.2d 1067, 1075 (D.C. 2008)).  Importantly, we have recognized that whether a trade practice is misleading under the CPPA generally is "a question of fact for the jury and not a question of law for the court." *Saucier*, 64 A.3d at 445.  Courts applying other consumer-protection statutes have recognized the same point.  *See, e.g.*, *Dumont v. Reily Foods Co.*, 934 F.3d 35, 40-41 (1st Cir. 2019) (concluding that it was for a jury rather than judges to decide on a full record whether the representation "has the capacity to mislead reasonably acting . . . consumers" (internal quotation marks omitted)); *Bell v. Publix Super*

---

[11] CVS makes the additional point that placement of products under generic signage is a true representation that products placed there are *intended* for a particular purpose.  But a representation may be misleading (e.g., about effectiveness) even if true (regarding intended purpose).  *See Peel v. Atty. Registration & Disciplinary Comm'n*, 496 U.S. 91, 121-22 (1990).  Walmart emphasizes case law holding that a retailer cannot be held accountable for representations or omissions on a third-party product's label.  But as we read CFI's complaint, it does not challenge the manufacturers' labeling of homeopathic products or even appellees' sale of homeopathic products; rather, CFI's challenge is to the placement of the products and the accompanying signage in stores and online.

*Mkts., Inc.*, 982 F.3d 468, 479 (7th Cir. 2020) ("It is not for the judge to determine, based solely upon his or her own intuitive reaction, whether the advertisement is deceptive." (internal quotation marks omitted)); *id.* at 493 (Kanne, J., concurring) ("[I]f a plaintiff's interpretation of a challenged statement is *not* facially illogical, implausible, or fanciful, then a court may *not* conclude that it is nondeceptive as a matter of law."); *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938-39 (9th Cir. 2008) (explaining that whether a business practice is deceptive "will usually be a question of fact not appropriate for decision on a motion to dismiss").

In this case, we do not find it facially implausible that a reasonable customer could believe, based on appellees' placement of homeopathic drug products alongside FDA-approved over-the-counter drugs, that homeopathic products are comparably efficacious.[12] We agree with CFI that whether signage and product

---

[12] It is true that "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense," *Iqbal*, 556 U.S. at 679, and that experience and common sense have sometimes constrained this court and others to dismiss a CPPA complaint for failure to state a claim. *See, e.g.*, *Floyd v. Bank of Am. Corp.*, 70 A.3d 246, 256-57 (D.C. 2013) (concluding as a matter of law, in light of "frequent media coverage" of the "widespread corporate use of overseas call centers in today's global economy," that a ten-digit "domestic-looking" telephone number for customer service did not create an objectively reasonable expectation that calling the number would entail speaking with a representative located in the United States); *see also Alicke v. MCI Commc'ns Corp.*, 111 F.3d 909, 912 (D.C. Cir. 1997) (dismissing CPPA claim based on

placement influence consumers regarding the efficacy of medical products is a question that can be answered only with evidence, "not an inherently implausible assertion that can be dismissed out of hand." The Superior Court reasoned that a reasonable customer would not be misled by the product placement since "homeopathic" appears on the front of the boxes of homeopathic drugs, the boxes indicate the products' "Uses," and package labels state that the products have not been evaluated by the FDA.[13] But, as other courts have reasoned in applying the reasonable-consumer test, "the reasonable consumer standard does not presume, *at least as a matter of law*, that reasonable consumers will test prominent front-label claims by examining the fine print on the back label." *Bell*, 982 F.3d at 477 (emphasis added); *see also id.* at 476 ("Many reasonable consumers do not instinctively parse every front label or read every back label before placing [products] in their carts."); *Danone, US, LLC v. Chobani, LLC*, 362 F. Supp. 3d 109, 123 (S.D.N.Y. 2019) ("[A] parent walking down the dairy aisle in a grocery

---

billing practice of reporting long-distance telephone calls in full-minute increments, because "no reasonable customer could actually believe that each and every phone call she made terminated at the end of a full minute"). But the factual scenarios in these cases are not comparable to the scenario of a consumer making choices from among products grouped together under the same signage.

[13] Again, CFI does not challenge the manufacturers' labeling of homeopathic products and does not assert that Walmart or CVS is responsible for inadequate labeling.

store, possibly with a child or two in tow, is not likely to study with great diligence the contents of a complicated product package, searching for and making sense of fine-print disclosures . . . . Nor does the law expect this of the reasonable consumer.").

Highlighting the Superior Court's reasoning, Walmart argues that CFI's complaints are devoid of facts to support an inference that consumers tend to believe that products placed next to each other are "comparable in efficacy." Similarly, CVS argues that CFI's complaint contains no factual support that could render plausible the allegation that placing homeopathic drugs in the same sections as science-based medicines implies to customers that there is no difference in the products' efficacy. It is true that CFI's complaints do not allege that any specific District of Columbia consumers have actually been misled (i.e., that any have concluded from the placement of homeopathic products next to FDA-approved drugs that the homeopathic products, too, are effective). But the allegations that the complaints do include and the public record, discussed below, persuade us that CFI "could plausibly prove that a reasonable consumer would be deceived"[14] by appellees' placement of homeopathic products. *Cf. Twombly*, 550 U.S. at 556

---

[14] *Williams*, 552 F.3d at 940.

("[S]tating a claim [under the Sherman Act] requires a complaint with enough factual matter . . . *to raise a reasonable expectation that discovery will reveal evidence* of illegal agreement" (emphasis added)); *id.* at 545 ("Asking for plausible grounds does not impose a probability requirement at the pleading stage[.]").  To state the point differently, we are satisfied that the allegations of the complaints and the public record suffice to "nudge[] [CFI's] claims across the line from conceivable to plausible." *Id*. at 570.

CFI's complaints contains a number of conclusory allegations,[15] but also contain numerous factual allegations and accompanying photographs to the effect that: the defendant retailers market themselves as offering products that will enable customers to get healthy; persons suffering an ailment will often turn to the pharmacy section of their neighborhood Walmart (or CVS) for relief; studies and patient experience have shown that homeopathic products are not effective; Walmart and CVS present homeopathic products alongside FDA-approved over-the-counter products, under aisle signs indicating that the aisles contain remedies

---

[15] E.g., "By intermingling homeopathic products, which have no scientific basis and no demonstrable efficacy, with science-based medicines, Walmart is deliberately sending a message that they are equally efficacious in the treatment of the conditions for which Walmart labels that section of the store or internet site." "A reasonable consumer would purchase these homeopathic products believing that they were equally as effective for the treatment of the listed symptoms or diseases as the science-based remedies displayed beside them."

for pain, colds, heartburn, and other conditions; and the retailers do so without informing customers that there is no scientific evidence that homeopathic products have any value in treating those symptoms and diseases. These factual allegations plausibly support an inference that, through their product placement practices, Walmart and CVS mislead consumers into believing that homeopathic products are equivalent alternatives to FDA-approved over-the-counter drugs.

As for the public record, it contains inter alia the following statements by the FTC:

> A statement that a product is based on traditional homeopathic theories might put some consumers on notice as to the basis of the product's efficacy claims. However, because many consumers do not understand what homeopathy is, the Commission does not believe that such a statement alone would adequately put consumers on notice that a product's efficacy claims are not backed by scientific evidence, and could, in fact, enhance the perceived credibility of the claim. Similarly, the Commission believes that a statement that a product's efficacy "has not been evaluated by the Food and Drug Administration" does not adequately address the potential lack of substantiation for a product's efficacy claims; dietary supplements bear a similar disclosure but [the] FDA does require that dietary supplement label claims be supported by competent and reliable scientific evidence. Finally, the Commission believes that a simple statement that a product's efficacy is not supported by scientific evidence does not convey the truly limited basis for the efficacy claim and that, to avoid deceiving consumers, it is likely necessary to explain that it is not accepted by modern medicine.

FTC Enforcement Policy Statement on Marketing Claims for OTC Homeopathic Drugs, 81 Fed. Reg. 90122, 90123 n.15 (Dec. 13, 2016).[16] The FTC further stated:

> [T]he FTC has long recognized that marketing claims may include additional explanatory information in order to prevent the claims from being misleading. Accordingly, the promotion of an OTC homeopathic product for an indication that is not substantiated by competent and reliable scientific evidence may not be deceptive if that promotion effectively communicates to consumers that: (1) There is no scientific evidence that the product works and (2) the product's claims are based only on theories of homeopathy from the 1700s that are not accepted by most modern medical experts.

81 Fed. Reg. at 90123 n.13. In light of both CFI's factual allegations and government-agency statements such as this, describing consumers' limited understanding about homeopathy and the potential for deception regarding homeopathic products, this is not a case where the plaintiff's "failure to provide a minimum amount of information prevents [it] from crossing the line from stating a claim that [is] possible to one that is facially plausible[.]" *Comer v. Wells Fargo Bank, N.A.*, 108 A.3d 364, 376-77 (D.C. 2015) (internal quotation marks omitted).

---

[16] CFI cited this FTC policy statement in its Walmart complaint, and Walmart cited the policy statement in its motion to dismiss.

Without further factual development, CFI's allegations may not suffice to allow CFI to defeat summary judgment[17] or to prevail at trial. But, at this juncture, we cannot say that it is implausible that a reasonable consumer might understand appellees' placement of homeopathic products alongside science-based medicines as a representation that the homeopathic products are efficacious or are equivalent alternatives to the FDA-approved over-the-counter drugs alongside which they are displayed.

## IV.  Conclusion

For the foregoing reasons, the judgments of the Superior Court are reversed, and the matters are remanded for further proceedings consistent with this opinion.

*So ordered.*

---

[17] Summary judgment is the proverbial "'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (internal quotation marks omitted).