*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters.  Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

Nos. 24-CV-0023 & 24-CV-0685

ELIZABETH GALVIN, APPELLANT,

V.

RUPPERT NURSERIES, INC., APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2020-CA-004445-B)

(Hon. Donald W. Tunnage, Trial Judge)

(Argued March 13, 2025                              Decided August 28, 2025)

*Paul A. Cunningham*, with whom *Neill C. Kling*, of the bar of the Commonwealth of Pennsylvania, *pro hac vice*, by special leave of court, was on the briefs, for appellant.

*William A. Goldberg* for appellee.

Before BECKWITH, EASTERLY, and SHANKER, *Associate Judges*.

SHANKER, *Associate Judge*: In 2020, appellant Elizabeth Galvin contracted with a tree nursery company, appellee Ruppert Nurseries, Inc., to obtain and install six trees on her property in northwest Washington, D.C.  When Ms. Galvin was dissatisfied with the trees, she refused to pay the remaining balance on the contract. Ruppert sued Ms. Galvin for breach of contract and Ms. Galvin asserted

counterclaims of breach of contract, breach of the duty of good faith and fair dealing, breach of the implied warranty of merchantability, and violations of the D.C. Consumer Protection Procedures Act (CPPA).

At a bench trial, the parties presented competing theories about Ruppert's obligations under the contract. In Ruppert's view, the contract obligated it only to select and install six trees on Ms. Galvin's property and maintain those trees for a six-week monitoring period. Because the parties agreed that Ruppert had selected, installed, and monitored the six trees, Ruppert argued that it had fulfilled its contractual obligations, triggering Ms. Galvin's obligation to pay Ruppert, which she had not done. Ms. Galvin told a different story. In her telling, Ruppert was required to install trees that would create "evergreen screening," meaning that the trees would fill gaps in her existing landscaping design to achieve a privacy fence at the edge of her property. Because the trees did not achieve that evergreen screening goal, and two of the trees died within a year of installation, Ms. Galvin argued that Ruppert breached the contract, along with the contract's duty of good faith and fair dealing, the implied warranty of merchantability, and the CPPA.

The trial court ruled in favor of Ruppert on its contract claim against Ms. Galvin and on almost all of Ms. Galvin's counterclaims against Ruppert. The sole claim on which the court ruled for Ms. Galvin was her implied warranty of

merchantability claim, as it related to one of the six trees. Throughout its findings and conclusions, the trial court rejected Ms. Galvin's theory of the case—that Ruppert was required to create evergreen screening to Ms. Galvin's liking—and instead concluded that Ruppert was required only to deliver and install the six trees and monitor them for six weeks.

Ms. Galvin appealed. She raises seven issues that branch into eight sub-issues, all of which are rooted in the three species of claims involved in this case: contract, CPPA, and implied warranty of merchantability. We address the issues under that framework, and, for the following reasons, we affirm on all grounds.

## I. Background

At the core of this case is the contract between Ms. Galvin and Ruppert and their conflicting theories about Ruppert's obligations and performance under the contract. In Ruppert's view, the contract required it to buy, install, and monitor six trees on Ms. Galvin's property, with no warranty on plant material supplied and installed by Ruppert. In Ms. Galvin's view, the trees were supposed to achieve a particular purpose on her property by filling gaps in her existing landscape design, achieving "evergreen screening." When the trees did not accomplish that purpose (with some trees shedding leaves and others dying), Ms. Galvin refused to pay the remaining balance on the contract.

## A.    Factual Background

In July 2020, Ms. Galvin signed a contract with Ruppert under which Ruppert would "furnish all labor, tools, materials, equipment and insurance necessary" to install six trees: three southern magnolias, one cryptomeria, one dogwood, and one hemlock. The installation included, among other things, "[b]ackfilling voids around trees with native soil," pruning "at time of installation," and "costs to obtain permits," and all work was to "be in accordance with the Landscape Specification Guidelines [(LSGs)] for the Baltimore Washington Metropolitan Area." The contract specified that there was "[n]o warranty on plant material supplied and installed by Ruppert Nurseries as part of this contract." Moreover, the contract stated that Ms. Galvin "acknowledge[d] that plants [were] being planted into locations that are considered low light conditions" and that "[l]ower branches and shaded sides of trees will thin out overtime in these situations." At the top of the contract, the "Re:" line identified the contract as "Galvin Evergreen Screening No Warranty." The total contract price, $345,800, was split into two payments: a fifty percent deposit "due at contract signing" and the remaining balance "due upon completion." Ms. Galvin paid the fifty percent deposit when she signed the contract.

When Ms. Galvin initially contacted Ruppert, she explained that her neighbor had "cut down all of the screening that was on their land but was essential to the

privacy in that corner of our property" and that she was "eager to restore as much of that as possible, probably with substantial evergreens of the most suitable variety." Ms. Galvin then hired a landscape architect, Holt Jordan, to work with Ruppert's arborist to visit the tree nurseries and select the trees for the project. Mr. Jordan personally inspected some of the trees for the project and designed the plan (including selecting the types of trees to be planted and the planting location for those trees). During the design and planning phase, Ruppert explained that planting the trees in the summer was not a concern, as the trees would transfer well with "proper care and maintenance before and after planting." The southern magnolias were sourced from a nursery in Florida and were transported via truck to Ruppert prior to installation. The other three trees (the cryptomeria, dogwood, and hemlock) were all grown in Maryland, and all three of those species are grown and frequently planted in the area.

Ruppert installed the six trees in late July 2020. After installation, Ms. Galvin's landscaper expressed that he was "happy with the trees," which seemed "to look as [if] they've always been there," and Ms. Galvin agreed that the "trees do look wonderful." Ruppert then handed off maintenance responsibilities to Ms. Galvin in early August. Approximately a week later, Ms. Galvin noticed "a considerable amount of Magnolia leaves which had been shed under all three of the

trees." When Ruppert requested that Ms. Galvin pay the remaining contract balance because it had finished installing and monitoring the trees, Ms. Galvin refused.

In late August, Ms. Galvin, through her attorney, sent a letter to Ruppert stating that she would "delay payment" of the remaining contract balance "while assessing whether the tree(s) were fit for their ordinary purpose at the time of planting and properly planted" given "the rapid decline in the state of the tree(s) provided and planted." Ms. Galvin admitted that she "took the risk that healthy trees properly planted, might not flourish over time." By September, the dogwood tree was dead, with the hemlock tree dying approximately ten months after installation. An existing maple tree on Ms. Galvin's property that was close to the planting zone also died.

## B.     Procedural Background

After Ms. Galvin refused to pay the remaining balance on the contract and negotiations proved unfruitful, Ruppert sued Ms. Galvin for breach of contract. Ms. Galvin counterclaimed for breach of contract, breach of the duty of good faith and fair dealing, breach of the implied warranty of merchantability, and violations of the CPPA. After a bench trial, the trial court made the following conclusions.

### 1. Ruppert's Breach of Contract Claim Against Ms. Galvin

The court concluded that there was a valid contract between Ruppert and Ms. Galvin. The contract required Ruppert to install six trees, transfer maintenance to Ms. Galvin, monitor the trees for six weeks, and complete all work in accordance with the LSGs. The court acknowledged Ms. Galvin's dissatisfaction with the trees based on her understanding of evergreen screening, but it declined to read the contract as requiring Ruppert to ensure evergreen screening because the contract "did not provide a metric for defining an end result or anything outside of the delivery and installation of six trees." In the trial court's view, Ruppert fulfilled its contractual obligations by delivering, installing, and monitoring the six trees. Further, the court concluded that the contract obligated Ms. Galvin to pay the remaining value of the contract at the end of the six-week monitoring period, which she had not done.

### 2. Ms. Galvin's Defenses & Counterclaims

Ms. Galvin alleged that Ruppert breached the contract by damaging an existing maple tree on her property; she claimed that Ruppert harmed the maple's roots when it installed the new trees nearby. According to Ms. Galvin, the root damage allowed the maple to contract armillaria root disease, which ultimately killed the tree. As to this claim, the court found that Ms. Galvin "did not meet her burden

of establishing by a preponderance of the evidence that the [m]aple tree died of [a]rmillaria," which, in the court's view, was "dispositive." In rejecting Ms. Galvin's claim that Ruppert breached the duty of good faith and fair dealing, the court was "unable to find by a preponderance of the evidence that there was a willful imperfect performance" or an "interference with [Ms. Galvin's] ability to perform her obligations under the contract."

The court then reached Ms. Galvin's counterclaim for breach of the implied warranty of merchantability, concluding that "four of the six trees are alive and were alive well past what was stated had there been a warranty in this contract [of] one year." The court further concluded that Ms. Galvin had not shown by a preponderance of the evidence that the hemlock was defective. But regarding the dogwood, which had died in September 2020, the court found that Ruppert breached the implied warranty of merchantability. The court rejected Ruppert's argument that the trees were merchantable if they were alive when they were installed, because trees can contain latent defects.

Ms. Galvin had also asserted CPPA claims. Applying a clear-and-convincing-evidence burden of proof, the court concluded that Ruppert did not violate the CPPA by failing to provide the evergreen screening that Ms. Galvin wanted, as the contract contained nothing explicit about evergreen screening. The

court also concluded that Ruppert had disclosed the risks of transplanting the trees during the summer and therefore Ms. Galvin's CPPA claim based on omission or misrepresentation of those risks failed.

In sum, the trial court found in Ruppert's favor on every claim and counterclaim except for Ms. Galvin's counterclaim that Ruppert breached the implied warranty of merchantability as to the dogwood tree. Ms. Galvin moved for reconsideration and relief under Super. Ct. Civ. R. 59(e), which the trial court denied because Ms. Galvin merely sought to "re-litigate issues already addressed" by the court.[1] This appeal followed.

## II.    Standard of Review

"After a bench trial, we review a trial court's factual findings for clear error and its legal conclusions de novo." *DCA Capitol Hill LTAC, LLC v. Capitol Hill*

---

[1] Ms. Galvin argues in somewhat cursory fashion that the trial court erred in denying her motion for reconsideration and other relief. She argues that Super. Ct. Civ. R. 59(e) allowed her to reargue previously articulated positions to correct legal errors. But Ms. Galvin's argument relies on the same alleged legal errors that she raises with respect to her other claims. Because we conclude that the trial court did not err in those respects, we similarly conclude that the trial court did not err in denying her motion for reconsideration and other relief. *Cf. In re Derricotte*, 885 A.2d 320, 324 (D.C. 2005) ("A trial court may grant a Rule 59(e) motion in order to correct manifest errors of law or fact.").

*Grp.*, 332 A.3d 518, 530 (D.C. 2025). "The proper interpretation of a contract term is a question of law, which we review de novo." *Id.* (citation modified).

Our review under the clear-error standard reflects the deference we must give to the trier of fact's decision because the trier of fact is "usually in a superior position to appraise and weigh the evidence." *Sanchez v. Sundely LLC*, 322 A.3d 529, 539 (D.C. 2024) (quoting *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 123 (1969)). "Nevertheless, a factfinder clearly errs if, after reviewing the evidence, we are left with the definite and firm conviction that a mistake has been committed." *Id.* (citation modified).

We have not addressed whether, for an implied warranty of merchantability claim, a determination that goods are fit for the ordinary purpose for which they are used is a factual finding or a legal conclusion. In two breach-of-warranty cases involving bench trials, we reviewed for clear error the determination whether the warranties had been breached. *District Concrete Co., Inc. v. Bernstein Concrete Corp.*, 418 A.2d 1030 (D.C. 1980) (explaining that whether defective concrete was poured was a factual finding); *Ford Motor Co. v. Keating*, 262 A.2d 600, 601 (D.C. 1970) (reviewing for clear error a finding that a car part was defective). We need not decide the question here and assume that we review de novo whether goods are fit for their ordinary purpose.

### III.  Analysis

Ms. Galvin raises an array of issues on appeal.  We discuss her assertions of error within the framework of the parties' claims in the trial court: (a) Ruppert's breach of contract claim and Ms. Galvin's breach of contract counterclaim, (b) Ms. Galvin's CPPA claims, and (c) Ms. Galvin's claim for breach of the implied warranty of merchantability.

### A.  Breach of Contract

Ms. Galvin argues that the trial court erred in concluding that Ruppert fulfilled its contractual obligations because, in her view, Ruppert did not comply with the LSGs.  She also contends that the court erred in failing to rule on her defense that Ruppert repudiated the contract by failing to provide adequate assurance of performance.  Ruppert maintains that the trial court correctly concluded that Ms. Galvin breached the contract and that her claim based on adequate assurances relies on a premise that the trial court rejected—that Ruppert was responsible for providing Ms. Galvin with an evergreen screen.

Under District of Columbia law, "a party asserting breach of contract must prove four elements: (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by

breach." *CorpCar Servs. Hous., Ltd. v. Carey Licensing, Inc.*, 325 A.3d 1235, 1244-45 (D.C. 2024) (citation modified). The trial court determined that (1) there was a valid contract between Ms. Galvin and Ruppert that (2) obligated Ms. Galvin to pay the full contract price after Ruppert completed its performance, that (3) Ms. Galvin breached by not paying the remaining balance after the trees were installed and the monitoring period concluded, and that (4) Ruppert had been damaged as a result of the nonpayment.

We begin with Ms. Galvin's argument that the trial court erred as a matter of law by "failing to recognize [Ruppert's] explicit obligation to comply with the [LSGs]." Based on the LSGs, Ms. Galvin argues that Ruppert breached the contract in several different ways, which she asserts the trial court did not address. But the trial court began by recognizing Ruppert's obligation under the LSGs, referencing the contract's provision that "all work shall be in accordance with the landscape specification guidelines." Although the court did not proceed point-by-point with respect to the LSGs, it generally indicated that Ms. Galvin did not establish Ruppert's failure to comply with the LSGs by a preponderance of the evidence, and it specifically stated that the evidence did not show by a preponderance that drainage issues were obvious or that the maple tree died from armillaria caused by Ruppert's actions. We are satisfied that the court sufficiently considered Ms. Galvin's

arguments regarding the LSGs and find no clear error in the trial court's appraisal of the evidence.

Ms. Galvin also takes issue with the trial court's explanation that the contract "did not provide a metric for defining an end result," but that statement is consistent with the contract's silence on whether the trees would provide evergreen screening. We discern no error in this statement by the trial court.

Next, Ms. Galvin argues that the trial court erred as a matter of law by concluding that Ruppert could prevail on its contract claim despite not having provided Ms. Galvin with adequate assurances of its performance. Ms. Galvin relies on D.C. Code § 28:2-609, a provision of the District's Uniform Commercial Code, which allows a party to a contract to "demand adequate assurance of due performance" if "reasonable grounds for insecurity arise with respect to the performance of either party." D.C. Code § 28:2-609(1). After demanding adequate assurance, the party may, if commercially reasonable, "suspend any performance for which he has not already received the agreed return." *Id.* Ms. Galvin contends that she demanded adequate assurances that the trees would provide the evergreen screen when she sent a letter to Ruppert in August 2020, complaining of the "rapid decline" of the trees and indicating that she would delay payment "while assessing whether the trees were fit for their ordinary purpose at the time of planting." Ms. Galvin

maintains that she did not receive "assurance of due performance" within thirty days of her letter, which she argues was a "repudiation of the contract." *See* D.C. Code § 28:2-609(4).

Although the trial court did not specifically address this theory, we conclude that Ms. Galvin's argument stems from an interpretation of the contract that the trial court expressly rejected. For Ms. Galvin to have reasonably sought adequate assurances, the contract must have required Ruppert to ensure that the trees would provide evergreen screening. But the court rejected that interpretation, concluding that the contract "did not provide a metric for defining an end result or anything outside of the delivery and installation of six trees." And this conclusion is supported by the contract itself, which required Ruppert to "furnish all labor, tools, materials, equipment and insurance necessary" to install six trees, without any reference to the trees' purpose or any guarantee that the trees would provide an evergreen screen. Although Ms. Galvin points to the "Galvin Evergreen Screen" language in the header of the contract, that language did not appear anywhere else in the document.

Because the contract required Ruppert to install six trees—and it is undisputed that Ruppert installed those six trees in July 2020—Ms. Galvin had no "reasonable grounds for insecurity" as to Ruppert's performance when she demanded adequate assurance in August 2020. Thus, Ruppert did not repudiate the contract even if it

failed to provide adequate assurances to Ms. Galvin. The trial court therefore did not err in denying Ms. Galvin's breach of contract claim against Ruppert or in concluding that Ms. Galvin breached the contract by withholding the remaining payment.

## B.    CPPA

Ms. Galvin contends that the trial court erred in rejecting her claim that Ruppert violated various provisions of the CPPA, specifically D.C. Code § 28-3904(a), (d), (e), and (f). Her CPPA claims are based on two theories: (1) the trees did not provide evergreen screening despite Ruppert having indicated that they would and (2) Ruppert misrepresented or omitted the risks involved with planting the trees in the summer.

The CPPA protects consumers against false, deceptive, or unfair business practices. *Earth Island Inst. v. Coca-Cola Co.*, 321 A.3d 654, 663 (D.C. 2024). It is a broad consumer protection statute, meant to "assure that a just mechanism exists to remedy all improper trade practices." D.C. Code § 28-3901(b)(1). It "establishes an enforceable right to truthful information from merchants about consumer goods and services," and is to be "construed and applied liberally" to effectuate that purpose. D.C. Code § 28-3901(c).

## 1. Burden of Proof

Throughout trial, Ms. Galvin maintained that she had to prove the punitive damages aspect of her CPPA claims by clear and convincing evidence and that Ruppert's conduct was intentional. But Ms. Galvin hedged, simultaneously arguing that the "underlying [CPPA] violations" were not intentional and she needed to prove those violations only by a preponderance of the evidence.

The trial court recognized this tension, asking Ms. Galvin, "[I]f the cause of action is CPPA and if you're going to prove your cause of action with non-intentional conduct, . . . how is it that the violation, the cause of action is then further evidence that it was malicious enough to satisfy punitive damages?" Ms. Galvin's counsel explained that although the violations were unintentional, "in doing these things, [Ruppert] sought to deprive Ms. Galvin of her rights under the statute," which was "willful and outrageous" and "intentional." Ultimately, the trial court applied the clear-and-convincing-evidence standard to Ms. Galvin's CPPA claims. On appeal, Ms. Galvin argues that the court should have applied a lower preponderance-of-the-evidence standard to her CPPA claims. Ruppert counters by arguing that Ms. Galvin's CPPA claims were in fact for intentional misrepresentations, such that she had to prove her claims by clear and convincing evidence. We agree.

Although we recently held that CPPA claims based on unintentional misrepresentations may be proved by only a preponderance of the evidence, *District of Columbia v. Facebook*, No. 23-CV-0550, 2025 WL 2166018, at *6-7 (D.C. July 31, 2025), Ms. Galvin's CPPA claims were based on intentional misrepresentations because Ms. Galvin argued that Ruppert acted willfully, outrageously, and intentionally and sought to deprive her of her rights under the statute. In light of her assertions of intentional misrepresentations, Ms. Galvin had to prove her CPPA claims by clear and convincing evidence, as the trial court concluded. *Osbourne v. Capital City Mortg. Corp.*, 727 A.2d 322, 325-26 (D.C. 1999) ("[T]he clear and convincing evidence standard applies to claims of intentional misrepresentation under the CPPA.").

### 2. Misrepresenting Tree Characteristics

Ms. Galvin argues that Ruppert violated two provisions of the CPPA by misrepresenting that the trees could provide an evergreen screen when the trees could not. It is a violation of the CPPA for any person to engage in an "unfair or deceptive trade practice," including representing that "goods or services have," among other things, "characteristics," "uses," or "benefits" that they do not have. D.C. Code § 28-3904(a). It is similarly a violation to represent that "goods" are of

a "particular standard, quality, grade, style, or model, if in fact they are of another." *Id.* § 28-3904(d).

We begin with Ms. Galvin's contention that the trial court improperly focused on her subjective state of mind instead of the reasonable consumer standard. Ms. Galvin is correct that "whether a trade practice is misleading under the CPPA generally is 'a question of fact for the [factfinder] and not a question of law for the court.'" *Center for Inquiry Inc. v. Walmart, Inc.*, 283 A.3d 109, 120 (D.C. 2022) (quoting *Saucier v. Countrywide Home Loans*, 64 A.3d 428, 445 (D.C. 2013)). But the trial court acknowledged the reasonable-consumer standard, stating that "a claim of an unfair trade practice" is properly "considered in terms of how the practice would be viewed and understood by a reasonable consumer." As the factfinder in a bench trial, the court then contrasted how a reasonable consumer would have understood Ruppert's conduct (as not guaranteeing any tree characteristics) with Ms. Galvin's subjective desire (for evergreen screening). In making that distinction, the trial court properly applied the reasonable-consumer standard, essentially concluding that Ms. Galvin's subjective understanding of the contract was not consistent with an objectively reasonable understanding of the contract.

The trial court likewise did not err in rejecting Ms. Galvin's CPPA claims based on Ruppert's alleged misrepresentations. As explained above in Part III.A.,

the court's finding that Ruppert had not represented that the trees would provide an evergreen screen, in part because that representation was not included in the contract, is supported by the evidence. We therefore affirm the trial court on this ground.

### 3. Misrepresenting or Omitting Risks of Tree Installation

Ms. Galvin argues that Ruppert violated the CPPA by misrepresenting or omitting the risks of installing the trees during the summer, including the risks to Ms. Galvin's existing trees on the property, specifically the maple tree that died after Ruppert installed a tree nearby. Under the CPPA, people and businesses are prohibited from "misrepresent[ing]" any "material fact which has a tendency to mislead." D.C. Code § 28-3904(e). That prohibition extends beyond literal falsehoods and includes any omissions, "innuendo[s]," or "ambiguit[ies]" that have a tendency to mislead reasonable consumers. *Id.* § 28-3904(f-1). We consider an alleged violation of the CPPA "in terms of how the practice would be viewed and understood by a reasonable consumer." *Saucier*, 64 A.3d at 442 (citation modified). "Importantly, we have recognized that whether a trade practice is misleading under the CPPA generally is a question of fact for the [factfinder] and not a question of law for the court." *Center for Inquiry*, 283 A.3d at 120 (citation modified).

The trial court found that Ruppert disclosed the risk of transplanting trees in the summer to Ms. Galvin and her landscaping team. Specifically, the court pointed

to an email wherein Ruppert communicated "the risk associated with summer planting" and its belief that any risk could be mitigated by "proper care and maintenance before and after transplanting." Clearly flowing from these findings is the conclusion that Ruppert did not omit any material facts that would have misled a reasonable consumer. We therefore affirm the trial court's decision on this CPPA claim.

## C. Implied Warranty of Merchantability

That leaves Ms. Galvin's implied warranty of merchantability counterclaim. Ms. Galvin argues that the trial court committed legal errors in analyzing whether Ruppert breached the implied warranty of merchantability. Ruppert argues that the trial court did not err because the trees were merchantable when they were installed.

In the District, there is an implied warranty of merchantability in contracts for the sale of goods if the seller is the merchant of the goods sold. D.C. Code § 28:2-314(1). To be merchantable, goods must be "fit for the ordinary purposes for which such goods are used." *Id.* § 28:2-314(2)(c). Ms. Galvin argues that the trees should have been fit for the ordinary purpose of providing an "immediate and lasting evergreen screen[ ]." The trial court rejected this ordinary purpose for the trees, instead concluding that the ordinary purpose of trees is to live and thus the implied warranty would be breached only if the trees died.

Assuming that we review de novo whether the trees were fit for their ordinary purpose, we agree that the contract supports the conclusion that the ordinary purpose of the trees was to live, not to provide evergreen screening. The contract itself contains only one reference to evergreen screening when identifying the project, without defining the term, setting forth any parameters, or guaranteeing that the trees would achieve any particular visual effect. Moreover, even if Ms. Galvin had opted for a one-year replacement warranty on the trees, that warranty would have covered only trees that died, not trees that failed to achieve a particular aesthetic purpose. Thus, we conclude that the ordinary purpose of the trees was to live, such that the implied warranty would be breached only if the trees died. We therefore affirm the trial court on this claim.

## IV.   Conclusion

For the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*